Shelley **WEINSTOCK,** Plaintiff–Appellant,

v.

**COLUMBIA UNIVERSITY,** Defendant–Appellee.

Docket No. 99–7979.

United States Court of Appeals, Second Circuit.

Argued March 9, 2000

Decided Aug. 23, 2000

---

Before: CARDAMONE, McLAUGHLIN, and PARKER, Circuit Judges.

CARDAMONE, Circuit Judge, dissents in a separate opinion.

McLAUGHLIN, Circuit Judge:

## BACKGROUND

This case arises from Columbia University's denial of tenure to Shelley Weinstock. Weinstock contends that the decision to deny her tenure was the result of

discrimination on the basis of her gender. Because this is an appeal from a grant of summary judgment to the defendant, we recite the facts in the light most favorable to the plaintiff, the nonmoving party. *See Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996).

Weinstock was employed by Barnard College, an undergraduate college and affiliate of Columbia, as an Assistant Professor in its Chemistry Department from July 1985 to June 1994. Weinstock became eligible for tenure during the Spring semester of the 1992–1993 academic year. Pursuant to an affiliation agreement between Columbia and Barnard, the Byzantine tenure process for Barnard faculty proceeds through the following votes.

First, (1) the faculty member's academic department at Barnard; (2) the Barnard Committee on Appointments, Tenure and Promotions; and (3) the counterpart department at Columbia, all must vote in favor of tenure. Then, Barnard's President decides whether to recommend that the process move forward. If the President of Barnard votes favorably, she forwards the nomination to the Provost of Columbia. The Provost then convenes a five-person University *ad hoc* committee to review the nomination. Under the terms of the affiliation agreement, the *ad hoc* committee consists of two faculty members designated by the Provost, two Barnard faculty members, and one faculty member from an outside institution. The tenure appointment will be made if: (1) the review of the *ad hoc* committee is favorable; (2) the Provost accepts that review; (3) the President of Columbia follows the advice of the Provost; and, finally, (4) the Trustees of Barnard and Columbia grant tenure.

Weinstock received the support of: (1) the Barnard Chemistry Department; (2) the Barnard Committee on Appointments, Tenure and Promotions; and (3) the Columbia Chemistry Department. The President of Barnard, Ellen Futter, who initially had reservations about Weinstock's

scholarship, then recommended that Weinstock's nomination be moved forward.

As required by the affiliation agreement between Barnard and Columbia, the Provost of Columbia, Jonathan Cole, convened an *ad hoc* committee. He appointed Professor Alan Tall, the Chair of Columbia's Department of Medicine, as the committee's Chair. He also appointed Professor Samuel Silverstein of Columbia's Department of Physiology and Cellular Biophysics, Professor Zanvil Cohn of Rockefeller University, Professor Lila Braine of Barnard's Department of Psychology and Professor Paul Hertz of Barnard's Department of Biological Sciences, as the committee's other members.

Protocol permits the Chair of an *ad hoc* committee to contact committee members before their meeting to determine whether they need more information to complete the candidate's file. Tall telephoned the committee members to discuss Weinstock's file, and to determine if any committee member wanted additional information. According to committee members Braine and Hertz, Tall also told each of them on the phone that he thought there were problems with Weinstock's candidacy. Both Braine and Hertz (from the Barnard faculty) reported these remarks, which they considered as going beyond a mere inquiry about lack of information, to Barnard's Dean, Robert McCaughey.

The *ad hoc* committee met on April 12, 1993. Present were all the committee members, Provost Cole and Dean McCaughey. At the outset of the meeting, Dean McCaughey questioned the extent of Tall's telephone calls to Professors Braine and Hertz. Provost Cole inquired whether any of the committee members' opinions of Weinstock had been tainted by their conversations with Tall. None of the members complained that they had been influenced. Provost Cole also reminded the *ad hoc* committee that the standards for tenure at Columbia were high, because Columbia is an internationally renowned research university. Professor Sally Chapman, the

Chair of Barnard's Chemistry Department, then presented Weinstock's case for tenure.

During the meeting, committee members Tall and Silverstein referred to Weinstock, whom they had never met, by her first name, "Shelley," and allegedly commented that she seemed "nice." Weinstock also alleges that she heard from Chapman and Hertz that Tall and Silverstein observed that she (Weinstock) seemed "nurturing." However, neither Hertz, Silverstein nor Tall remembers hearing the word "nurturing."

Tall and Silverstein deemed Weinstock's publications and research papers insufficient to merit tenure. In their depositions, they testified that her research lacked originality and that the journals in which she published were not first-tier scientific journals. Tall and Silverstein were also unimpressed with Weinstock's letters of recommendation. Silverstein noted that the letters were lukewarm by comparison to letters he had examined in other tenure reviews.

The committee eventually voted 3–2 to grant Weinstock tenure. Braine, Hertz, and Cohn voted for tenure; Tall and Silverstein voted against it. A 3–2 favorable vote is considered "underwhelming [in terms of] support," according to Columbia's current President, George Rupp. From 1989 to the present, at least six tenure candidates (five male, one female) were denied tenure after a 3–2 *ad hoc* committee vote in favor of granting tenure.

The decision to accept or reject the committee's vote moved to Provost Cole's desk. Before Provost Cole made his decision though, he contacted Ronald Breslow, a member of the Columbia Chemistry Department, for his insights. Breslow stated bluntly that, measured by intellectual strength and scientific ability, Weinstock was not in the same league as other tenured members of the Barnard Chemistry Department.

Provost Cole also discussed Weinstock's candidacy with the Chair of the Columbia Chemistry Department, Richard Bersohn. From these inquiries, as well as from a previous inquiry of Bersohn by Associate Provost Stephen Rittenberg, Cole learned that: (1) the general sentiment of the Columbia Chemistry Department was that Weinstock's work was unimaginative and that her publication record was weak; (2) the Columbia Department did not deem her worthy of tenure; but (3) the Columbia Department had voted to recommend her for tenure as a *courtesy* to their counterpart department at Barnard.

Provost Cole eventually recommended against tenure for Weinstock because he felt that her scholarship was not up to snuff.

The President of Columbia, Michael Sovern, who followed provostal recommendations on tenure as a matter of course, accepted Cole's recommendation and denied Weinstock tenure.

Weinstock learned in May 1993 that she had been denied tenure. Dean McCaughey from Barnard immediately objected to alleged procedural flaws in the tenure process, and requested that Provost Cole either reverse his decision and follow the *ad hoc* committee's recommendation to grant tenure, or reconvene the *ad hoc* committee to consider the additional inputs that Provost Cole had gathered from Professors Breslow and Bersohn. Dean McCaughey apparently was disturbed that the committee did not have the benefit of the information—damning as it was—that Provost Cole had collected from Breslow and Bersohn. Provost Cole though, refused to change his recommendation or to reconvene the committee.

Under the rules of the tenure process for Barnard candidates, if the Provost does not accept the vote of the *ad hoc* committee, he must say why. Provost Cole did this only after Professor Braine wrote two letters requesting such a clarification. In his explanation, Provost Cole stated that: (1) a favorable vote of 3–2 was not a strong

endorsement; (2) the two Columbia members of the committee, Tall and Silverstein, felt that Weinstock's research was limited and below the quality expected of a candidate for tenure; (3) candidates from Columbia and Barnard were to be judged for tenure by the same standards; (4) Cohn, the outside member of the *ad hoc* committee (Rockefeller University), had stated that Weinstock would not receive tenure at a research university such as Columbia even though he conceded that her research was adequate for an institution such as Barnard; and (5) he had collected evaluations from Breslow and Bersohn confirming his assessment that Weinstock did not merit tenure.

Citing procedural irregularities in Weinstock's tenure process, Barnard President Futter urged President Sovern to reject Provost Cole's recommendation and to accept the favorable recommendation of the *ad hoc* committee. In the alternative, President Futter requested that a new *ad hoc* committee be appointed to review Weinstock's application.

By this time, George Rupp had replaced Sovern as President of Columbia. In response to President Futter's protest, President Rupp wrote a letter informing President Futter that he had reviewed Weinstock's case and that he agreed with Provost Cole's determination that her research was not up to the standards expected of a tenured faculty member. President Rupp also indicated that he did not believe there were any procedural irregularities in Weinstock's tenure process. Accordingly, Rupp declined to interfere.

In February 1995, Weinstock filed a complaint in the United States District Court for the Southern District of New York (Keenan, *J.*), alleging that, by denying her tenure on the basis of her sex, Columbia violated: (1) Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.;* (2) Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 *et seq.;* (3) the New York State Human Rights Law, New York

Executive Law § 296 *et seq.;* and (4) the Administrative Code of the City of New York § 8–107 *et seq.*.

Upon completion of discovery, Columbia filed a motion for summary judgment. The district court granted the motion, concluding that Weinstock had failed to produce any evidence to establish a triable issue of fact as to the pretextual nature of Columbia's legitimate, non-discriminatory reason for denying her tenure. Weinstock now appeals.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*. *See Bedoya*, 91 F.3d at 351.

### I. *Summary Judgment Standards*

Summary judgment as a tool for clearing the calendar of doomed lawsuits finds its modern origins in nineteenth century English practice. *See* John A. Bauman, *The Evolution of the Summary Judgment Procedure*, 31 Ind. L.J. 329 (1956). When the procedure migrated to this country, it was vastly expanded—England had limited it largely to actions on negotiable instruments (*see* Gregory A. Gordillo, *Summary Judgment and Problems in Applying the Celotex Trilogy Standard*, 42 Clev. St. L.Rev. 263 (1994))—and applied to almost all civil cases. In federal practice it was vigorously championed by Yale Law Professor (and later a member of this Court) Charles Clark, who spearheaded the drive to include Rule 56 in the 1938 version of the Federal Rules of Civil Procedure.

In state practice, the great acolyte of summary judgment was Bernard Shientag of the New York State Supreme Court. As he wrote in *Pross v. Foundation Properties*, 158 Misc. 304, 285 N.Y.S. 796, 800 (Sup.Ct.1935):

Why should [the defendant] be harassed and inconvenienced and perhaps damaged in his business and credit if it clearly appears that the plaintiff can entertain no hope of success? True, the

defendant will prevail at the trial, but he will have been subjected to considerable expense by way of attorneys' fees and preparation for trial, for which, under our present system, he will not be compensated by the costs imposed. What better way is there for doing away with the multiplicity of unfounded and worthless suits with which our calendars are clogged?

■ Summary judgment is now appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When viewing the evidence, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in [the non-movant's] favor." *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990).

■ Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. When the motion is made, we go beyond the paper allegations of the pleadings, which were enough to survive the common law demurrer. The time has come, as James and Hazard put it, "to put up or shut up." Fleming James, Jr. & Geoffrey C. Hazard, Jr., *Civil Procedure* 150 (2d ed.1977). Accordingly, unsupported allegations do not create a material issue of fact. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *see also Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991).

■ Summary judgment is appropriate even in discrimination cases, for, as this Court noted, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985). Just a few short years ago we went out of our way to remind district courts that the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *McLee v. Chrysler Corp.*, 38 F.3d 67, 68 (2d Cir.1994); *see also Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60 (2d Cir.1997) (upholding grant of summary judgment for defendant in Title VII sex discrimination case). The Supreme Court has also recently reiterated that trial courts should not " 'treat discrimination differently from other ultimate questions of fact.' " *Reeves v. Sanderson Plumbing Prods., Inc.*, — U.S. —, —, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

II. *Columbia's Motion for Summary Judgment*

Weinstock contends that the district court erred by holding that she failed to establish a deprivation of her rights under Title VII, and by concluding that there were no triable issues of fact with respect to the pretextual nature of Columbia's legitimate, non-discriminatory reason for denying her tenure. Columbia counters that Weinstock has not produced any evidence to support her sex discrimination claim, and that the district court properly dismissed her case.

A. *The Title VII Scrutiny*

Title VII makes it unlawful "for an employer . . . to fail to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or

national origin." 42 U.S.C. § 2000e–2(a)(1).

■ In a Title VII sex discrimination case such as this, where there is no direct or overt evidence of discriminatory conduct, we apply the three-part burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to determine whether summary judgment is appropriate. *See Fisher v. Vassar College,* 114 F.3d 1332, 1335–36 (2d Cir.1997) (*en banc* ).[1]

■ First, the plaintiff must establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Here, the district court, viewing the facts in the light most favorable to Weinstock, found that she satisfied her *de minimis* burden of proof at the *prima facie* stage.

■ That is not the end of the story, however. Even if the plaintiff succeeds in presenting a *prima facie* case, the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Shumway,* 118 F.3d at 63. Upon the defendant's articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the *prima facie* case drops from

the picture. *See St. Mary's,* 509 U.S. at 510–11, 113 S.Ct. 2742; *Fisher,* 114 F.3d at 1336. For the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination. The plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].' " *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996) (quoting *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir.1994)). In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, "[i]t is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *St. Mary's,* 509 U.S. at 519, 113 S.Ct. 2742.[2]

Applying these standards here, the district court held that Columbia had articulated a legitimate reason for its tenure decision—namely, that Weinstock's scholarship was not up to its standards. The district court also found that Weinstock had failed to come up with any evidence that this reason was a pretext. We find no error in the district court's analysis.

1. *Columbia's legitimate, non-discriminatory reason for denying Weinstock tenure*

■ Columbia's legitimate, non-discriminatory reason for denying Weinstock

---

1. The identical standards apply to employment discrimination claims brought under Title VII, Title IX, New York Executive Law § 296, and the Administrative Code of the City of New York. *See Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 248 (2d Cir.1995); *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 (2d Cir. 1996); *Jalal v. Columbia Univ.,* 4 F.Supp.2d 224, 232 n. 10 (S.D.N.Y.1998).

2. The Supreme Court recently reaffirmed this framework in *Reeves,* —— U.S. at ——, 120 S.Ct. at 2108. We decline to tarry on the question of how much evidence is necessary to find pretext for the simple reason that, as the district court held, Weinstock "has not produced any evidence to support a finding that a triable issue of fact exists with respect to the pretextual nature of [Columbia's] stated legitimate, non-discriminatory reason for ... denying tenure."

tenure was that she did not meet the standard for scholarship uniformly applicable within the University. There can be no doubt that this was a valid reason for her tenure decision.

█ When a college or university denies tenure for a valid, non-discriminatory reason, and there is no evidence of discriminatory intent, this Court will not second-guess that decision. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 455–56 (2d Cir.1999); *Fisher*, 114 F.3d at 1344–45.

Indeed, in *Bickerstaff*, this Court recently upheld a grant of summary judgment to Vassar College, dismissing a Title VII sex discrimination claim, because the district court correctly determined that the tenure candidate "did not satisfy the posted criteria for promotion." 196 F.3d at 444.

Here, *ad hoc* committee members Tall and Silverstein testified in their depositions that they believed that Weinstock's publications and research papers were insufficient to merit tenure. They also testified that her research lacked originality and that the journals in which she published were not first-tier scientific journals. Neither Tall nor Silverstein was impressed with Weinstock's letters of recommendation. Silverstein noted that the letters were lukewarm by comparison to other letters he had examined in other tenure reviews.

Even though the *ad hoc* committee voted 3–2 to grant Weinstock tenure, Provost Cole recommended against tenure because her scholarship was questionable. Rejecting a committee vote was nothing new, however, because, according to Columbia's current President George Rupp, a 3–2 favorable vote is considered "underwhelming in terms of support," and from 1989 to the present, as earlier noted, at least six tenure candidates (five male, one female) were denied tenure after an *ad hoc* committee voted 3–2 in favor of granting tenure.

Before Provost Cole made his recommendation to disagree with the 3–2 vote,

he contacted Ronald Breslow, a member of the Columbia Chemistry Department for further comment. It should come as no surprise that Cole, who is not a biochemist, did not read Weinstock's publications during the decision-making process, but instead relied upon the input of other professors who had a better grasp of her work. Breslow stated that Weinstock was not in the same class as other tenured members of the Barnard Chemistry Department in terms of intellectual strength or scientific ability. Provost Cole also discussed Weinstock's candidacy with the Chair of the Columbia Chemistry Department, Richard Bersohn. From these inquiries, as well as from a previous inquiry of Bersohn by Associate Provost Rittenberg, Cole learned that: (1) the general sentiment of the Columbia Chemistry Department was that Weinstock's work was unimaginative and that her publication record was weak; (2) the Columbia Department did not deem her worthy of tenure; but (3) the Columbia Department had voted to recommend her for tenure as a courtesy to their counterpart department at Barnard.

We conclude that when Provost Cole recommended to the President of Columbia that Weinstock's tenure be denied, the legitimate, non-discriminatory reason that she was not academically qualified was established.

#### 2. *Pretext*

Weinstock contends, however, that this was all a mere cover for discrimination, because there exists evidence of: (1) gender stereotyping; (2) procedural irregularities in the *ad hoc* committee process; and (3) disparate treatment. We look at each of these claims in turn.

##### a. *Gender stereotyping*

Weinstock contends that during the *ad hoc* committee meeting, she was referred to in a patronizing tone and that statements were made that stereotyped her and demonstrated gender bias. Specifically, Weinstock claims that committee members

Tall and Silverstein referred to her as "nice" and "nurturing," and that these statements are essentially code words for gender bias because they reflect feminine stereotypes. Weinstock argues that this is evidence of pretext. We disagree.

First, there appears to be no admissible evidence to support Weinstock's allegation that anyone on the committee referred to her as "nurturing." Weinstock claims that she *heard* from Chapman that the word "nurturing" was used. However, in Chapman's deposition, in which Weinstock's attorney took part, Chapman never stated that the word "nurturing" was used. Weinstock claims that Hertz, too, *told* her the word "nurturing" was used. However, when Hertz was deposed by Weinstock's attorney, Hertz stated, "I don't remember them using the word 'nurturing....'" Silverstein, in his deposition, also stated that he did not remember the word "nurturing" being used. Tall, as well, stated that he did not remember the word "nurturing."

Weinstock has failed to offer any direct evidence, or any testimony, from any person present at the committee meeting, that the word "nurturing" was used during her tenure process. Hertz denies it; Silverstein does not remember it; and Chapman, when deposed, was never even queried on the matter. Therefore, because Rule 56 of the Federal Rules of Civil Procedure provides that an affidavit submitted in opposition to summary judgment "shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence," Fed.R.Civ.P. 56(e), Weinstock has adduced no evidence sufficient to create a genuine issue of fact as to her contention that the word "nurturing" was used. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.1999).

■ Second, even assuming that the words "nice" and "nurturing" were used, this fact alone provides no evidence of pretext or discriminatory intent on the part of Columbia. "Nice" and "nurturing" are simply not qualities that are stereotypically female.

Any reasonable person of either sex would like to be considered "nice." It is indefensible to conclude that an employer's use of the word "nice" evinces gender discrimination. Were it so, every time an employer said, "[Bob or Sue], you are a nice person and a hard worker, but I am going to have to let you go," such a statement would become a basis for a Title VII discrimination claim.

This is not a case like *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), where the Supreme Court held that Title VII was violated when Ann Hopkins was denied a promotion because she was perceived negatively for lacking stereotypical feminine character traits. Specifically, her superior had advised her to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Price Waterhouse*, 490 U.S. at 235, 109 S.Ct. 1775. These statements were a clear indication that Hopkins' superiors had discriminated against her on the basis of sex, because she did not fit the sexual stereotype of what a woman should be. Weinstock, on the other hand, faced no such carping.

Nor can "nurturing" possibly be the basis for a Title VII action. The two primary definitions of the verb "nurture" are "to supply with food, nourishment, and protection" and "to train by or as if by instruction." *Webster's Third International Dictionary* (1961). These are definitions that are in no way stereotypically female.

Finally, there is no evidence that these words were ever used to describe Weinstock's quotidian research, which was the proffered non-discriminatory reason for Columbia's decision to deny her tenure. These words, if used at all, were spoken only in connection with Weinstock's teaching, *i.e.*, her classroom performance. It is simply not objectively reasonable to label

these innocuous words as semaphores for discrimination. To do so would preclude tenure committees from ever discussing a candidate's positive personal attributes as a teacher. Niceness and nurturing are not, after all, bad qualities to have in a teacher's mentoring capacity—particularly of undergraduates.

### b. *Procedural irregularities*

■ Weinstock contends that there was a series of procedural irregularities in her tenure process that evidences discriminatory intent on Columbia's part. Specifically, Weinstock takes issue with Tall's phone calls to the committee members before the committee convened, and Provost Cole's delay in explaining why he rejected the committee's vote and recommended denial of Weinstock's tenure. There is, however, no evidence that Weinstock's sex played a role in any alleged procedural irregularities, and there is, again, no evidence of pretext.

■ It is true that " '[d]epartures from procedural regularity ... *can* raise a question as to the good faith of the process where the departure may reasonably affect the decision.' " *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) (emphasis added) (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984)). In this case, however, whatever irregularities existed did not affect the final decision to deny Weinstock tenure. The phone calls that Tall made prior to the committee meeting had no effect on any committee member's assessment of Weinstock's candidacy for tenure. In deposition testimony, the committee members acknowledged as much. Moreover, the committee voted 3–2 in favor of granting her tenure. Provost Cole made his decision to reject the committee's recommendation; and his delay in explaining his recommendation did not affect that decision itself. Therefore, any possible procedural irregularities in the denial of Weinstock's tenure were not enough to suggest gender bias.

Furthermore, the dissent incorrectly concludes that "procedural defects in the tenure review process[ ] call[ ] into question Columbia's proffered nondiscriminatory reason for denying tenure." The phone calls that the dissent characterizes as a "procedural irregularity," in fact, only serve to support Columbia's proffered non-discriminatory reason for denying Weinstock tenure. The deposition testimony of Professors Hertz, Silverstein, Braine, and Tall all support the conclusion that Professor Tall indicated from the very beginning that he had concerns about the quality of Weinstock's research and that he was concerned that the materials in her dossier were not of "tenurable" quality. The consistency of the viewpoint expressed by Tall—that Weinstock's research was subpar—only further supports Columbia's proffered nondiscriminatory reason for denying Weinstock tenure.

### c. *Disparate treatment*

■ Weinstock also alleges that she was held to a stricter standard for tenure because she is a woman, and argues that this is evidence of discriminatory intent on Columbia's part. Specifically, she contends that Barnard professors are traditionally held to a lesser scholastic standard than Columbia professors, and complains that she was not cut this slack during her candidacy. The evidence, however, is to the contrary.

According to Columbia, the standard for *quality* of research that is expected of tenure candidates from Barnard and Columbia is identical, although a lower level of *productivity* in research and publication is accepted from Barnard candidates because they typically have a heavier teaching load. Any difference in productivity standards, however, is of no import, because Columbia's non-discriminatory reason for denying Weinstock tenure involved the quality, not the quantity, of her research. That the quality of research for both Columbia and Barnard professors

must be uniform is undisputed by Presidents Rupp, Sovern and Futter.

Weinstock disagrees. She asserts that Columbia applied a stricter standard to her than to male Barnard candidates in the hard sciences; she believes she was measured by the "higher" standard for tenure required of a Columbia-based candidate. Weinstock's only support for this assertion is her contention that a year after she was denied tenure, Columbia granted tenure to a male Barnard faculty member in its Physics Department, Timothy Halpin–Healy, whose research was supposedly *below* the standard that would be expected by his counterpart department at Columbia.

Initially, Weinstock fails to support her claim that a different standard was used during the two tenure hearings in question. Provost Cole's notes unmistakably indicate that at both hearings the committee discussed whether the candidate would receive tenure at Columbia. Additionally, Weinstock's only evidence that Halpin–Healy's research was subpar in this regard was the fact that one unidentified member of his *ad hoc* committee may have expressed the opinion that his research was not up to Columbia University standards. However, there is no other evidence that any other member of his *ad hoc* committee shared this view, and in fact, the committee voted unanimously to grant Halpin–Healy tenure. It cannot be said therefore that Halpin–Healy was held to a laxer standard than Weinstock when he was granted tenure.

 The dissent contends that certain statistical evidence, culled from an amicus brief and never presented to the district court or on appeal, is probative of sex discrimination. Specifically it argues that

raw data purportedly describing a pattern of under-representation and unequal opportunity for women faculty at Columbia leads to the conclusion that gender discrimination is in play here. This, however, is little but an unsupported hypothesis providing no foundation for the assertion that there was discrimination in *Weinstock's* tenure process. See *Zahorik,* 729 F.2d at 95; *Pollis v. New School for Social Research,* 132 F.3d 115, 123 (2d Cir.1997). The "statistical evidence" is also simply not part of the record, and is therefore material that cannot be considered in deciding this case.[3] See *International Business Machines Corp. v. Edelstein,* 526 F.2d 37, 45 (2d Cir.1975) (*per curiam* ).

. Columbia had a legitimate, non-discriminatory reason for denying Weinstock tenure—she lacked the requisite scholarship required. A claim that a single, supposedly less qualified male received tenure in the hard sciences at Barnard does not signify sex bias because "the record at best indicates a difference of opinion in evaluation of scholarly merit," and not gender discrimination aimed at Weinstock. *Zahorik,* 729 F.2d at 94.

### B. *The Dissent's Assertions*

Trolling for an issue of fact, the dissent marshals twelve supposed "disputed issues of fact," and claims that their existence suggests pretext and should have given Weinstock "her day in court."

The first "issue" found by the dissent involves the phone calls made by committee Chair Tall to the *ad hoc* committee before it met to discuss Weinstock's tenure candidacy. The dissent contends that the fact that these calls were made at all "calls into question Columbia's proffered nondiscriminatory reason for denying Weinstock tenure." However, as previously noted, it

---

**3.** The dissent also states that a Columbia professor has characterized the University's record in tenuring women as a "scandal." This is a distortion. The professor actually stated that Columbia had two tenured women in its Chemistry Department, that this was a "good" record in comparison to other re-

search institutions, and that the overall picture was a "scandal." If anything, this is a backhanded compliment, because the professor also stated that Columbia was "somewhat better" at tenuring women than other universities.

is standard operating procedure for a committee Chair to call members of an *ad hoc* committee to see if they need anything before the committee meets. Granted, it would be inappropriate to criticize a candidate in this type of phone call; but whether Tall criticized Weinstock is immaterial because no *ad hoc* committee member testified that Tall's comments in any way influenced their view or eventual vote. In any event, given that the dissent focuses on the alleged bias of Provost Cole, the primary decisionmaker, the fact that Professor Tall may have made inappropriate phone calls is all the more immaterial.

 In an effort to tar *ad hoc* committee members Tall and Silverstein as biased, the dissent reaches for an article in the *Yale Journal of Law and Feminism,* again provided by amici. The dissent claims that Tall's and Silverstein's reference to Weinstock by her first name, "Shelley," is evidence of gender bias. The dissent notes that the Yale article found that in 1,730 student evaluations of law school faculty, male professors were never referred to by their first names. However, the Yale article does *not* at all discuss tenure hearings of either female or male professors or comments made by faculty, and is therefore irrelevant to this case. *See* Christine Haight Farley, *Confronting Expectations: Women in the Legal Academy,* 8 Yale J.L. & Feminism 333, 339–40 (1996).

The second and third "issues" noted by the dissent involve the standards that must be met for a professor to earn tenure at Columbia. The dissent claims that Provost Cole "took an active role and expressed a negative view of Weinstock." However, at the *ad hoc* committee meeting, Cole's central message was that the standards for any tenure candidate, whether from Barnard or Columbia, are "University-wide." Even the President of Barnard embraces this standard.

 Cole's constant reiteration that "the criteria and standards of judgment for all tenure nominations in the University are the same" could conceivably be seen as negative in light of Weinstock's subpar scholarship. However, his charge to the committee on these standards was a correct representation of University policy, and cannot reasonably be viewed as evidence of discrimination, because it is not this Court's role to secondguess the application of that policy to Weinstock. After all, "[Columbia] alone has the right to set its own criteria for promotion and then to evaluate a candidate's fitness for promotion under them." *Bickerstaff,* 196 F.3d at 455–56 (citing *Lieberman v. Gant,* 630 F.2d 60, 67 (2d Cir.1980) (Friendly, *J.*) ("A university's prerogative 'to determine for itself on academic grounds who may teach' is an important part of our long tradition of academic freedom.") (quotation omitted)). Instead, this Court's "role is narrowly limited to determining whether an illegitimate discriminatory reason played a motivating role in the employment decision." *Bickerstaff,* 196 F.3d at 456. Because we conclude that discrimination played no such role here, we decline to join the "Super–Tenure Review Committee[ ]" apparently envisioned by our dissenting colleague. *Pollis,* 132 F.3d at 123 n. 5 (cautioning that Congress did not intend, in making Title VII applicable to educational institutions, for courts to sit as "Super–Tenure Review Committees") (quoting *Gant,* 630 F.2d at 67 (Friendly, *J.*)).

 The fourth "issue" that the dissent marshals as evidence of gender discrimination is captious. It criticizes Provost Cole for an error he made in his initial letter to Barnard College when he stated that he agreed with the *ad hoc* committee's vote to deny Weinstock tenure. The committee had actually voted 3–2 in favor of tenure; and Cole, of course, did not agree with the committee. He corrected his letter immediately. This mistake, however, is immaterial, and hardly supports a conclusion that Cole's decisionmaking was tainted by gender discrimination.

■ The dissent next assails Provost Cole's character, actually calling him "mendacious." The basis for this alleged mendacity is the fact that Cole sought further information on Weinstock's scholarship from Professors Bersohn and Breslow of the Columbia Chemistry Department. The dissent, in a statement reminiscent of a spy thriller, claims that Cole "obtained from Professor Breslow what he wanted." There is no record evidence stating what Cole "wanted;" and the fact that he sought additional input on Weinstock's scholarship is nothing out of the ordinary, especially given the broad powers that a Provost has during tenure decisions at Columbia. Professor Breslow *was* blunt in his assessment of Weinstock, stating that, in terms of intellectual strength and scientific ability, she was not in the same league as other tenured members of the Barnard Chemistry Department. However, the fact that this statement was deleterious to Weinstock does not make it what Cole "wanted," and it certainly does not prove him to be "mendacious."

■ The sixth "issue" the dissent raises is a contention that in his personal notes Provost Cole paid little heed to Weinstock's research or scholarship, but was instead concerned primarily with her personal characteristics, thereby exhibiting his inherent gender bias. This is just wrong. The record shows that Cole's notes solidly address Weinstock's scholarship. They are as follows:

(1) Lessinger & Chapman—quality—not up to quality level of either of the two current members of the Chemistry Dept.

(2) Nobody in terms of intellectual power; work in periphery of the field

(3) Wouldn't make it at City College—probably wouldn't make tenure at City College

(4) Never had anything sensible to say at colloquium; other[s] from Bar-

nard are raising interesting questions

(5) Ph.D. defenses—nothing; a "pushover"—not impressive

(6) perfectly nice person.

■ In the seventh "issue" cited by the dissent, it is alleged that Provost Cole was off base when he inquired into the sincerity of the Columbia Chemistry Department's favorable recommendation. The dissent states that Cole failed to follow "formalized procedure," and that this is evidence of discrimination. The trouble with this argument is that there is no "formalized procedure" forbidding Cole to engage in such an inquiry. Cole had learned from Professors Bersohn and Breslow that the vote of the Columbia Chemistry Department was a mere "courtesy," and Cole took that into account when making his final tenure decision. Given that there were four abstentions in the department vote (a rare occurrence), it is not hard to conclude that the positive votes may well indeed have been a "courtesy." It was certainly not a sign of discrimination when Cole chose to so interpret it.

The eighth "issue" is difficult to comprehend. The dissent claims that, as a matter of logic, Provost Cole's statement that he based his tenure decision partly upon the poor assessments of Weinstock's scholarship by Professors Bersohn and Breslow makes no sense. This is because Professors Bersohn and Breslow, as members of the Columbia Chemistry Department, would have had to have either abstained or voted in favor of recommending tenure for Weinstock, since the Department vote contained no negative votes. The dissent therefore concludes that Bersohn and Breslow could not have been against granting Weinstock tenure. This mind game certainly does not generate a material question of fact. In any event, we have already noted that Professor Breslow stated bluntly that he thought Weinstock was not in the same league as other tenure members of the Barnard Chemistry Department. That statement alone is enough

to support Provost Cole's conclusion that Professor Breslow had a negative view of Weinstock's scholarship.

▆ The ninth "issue" finds an inconsistency between Professor Cohn's view of Weinstock and Provost Cole's characterization of that view. After Weinstock was denied tenure, Cohn, a member of the *ad hoc* committee who had voted for tenure, wrote that he "was strongly swayed by her excellence as a teacher and mentor" and that he "was less disturbed about [her research] which [he] found rather imaginative." Cole, in a letter to Columbia's President explaining why he decided not to grant Weinstock tenure, stated that Professor Cohn thought her research was "weak." However, because Columbia's decision was based on Weinstock's research, which Cohn indicated was *not* the primary basis for his "yes" vote, the fact that Cole may have misconstrued Cohn's view of Weinstock's research is inconsequential.

▆ "Issue" ten focuses on Provost Cole's delay in writing a letter to delineate the reasons for his decision to reject the 3–2 recommendation of the *ad hoc* committee. After being prodded by *ad hoc* committee member Professor Lila Braine, Cole sent a letter explaining his reasons, and in it stated that his explanation "would be prepared within the context of our defense of the University." This defensive statement was understandable. Weinstock had already filed a charge of discrimination with the EEOC when Cole wrote his letter. The dissent interprets Cole's statement as evidence of pretext, but his letter of explanation amounts to nothing but a reiteration of the fact that Weinstock was denied tenure because her research was not up to snuff.

In its "issue" eleven, the dissent contends that the tenure standards for a male Barnard professor, Timothy Halpern–Healy, were lowered, and that Weinstock, because she was a woman, did not receive the same treatment. There is no basis for this assertion in the record. The dissent claims that "a male professor at the Physics Department was granted tenure at Barnard despite the fact that one member of his *ad hoc* committee *acknowledged* that he would not have received tenure in the Physics Department at Columbia." His *ad hoc* committee, as a whole however, did no such thing. The most that can be said is that *one member* of that committee stated that Halpern–Healy would be in the bottom ranks of Columbia's Physics Department. There is no evidence that the entire committee "acknowledged" that Halpern–Healy would not receive tenure at Columbia.

▆ The final "issue" noted by the dissent concerns an assertion that Provost Cole disingenuously informed Professor Braine, a member of the *ad hoc* committee, that part of the reason Weinstock was denied tenure was because of the financial impact of tenure on University finances. There is, however, no basis in the record for this assertion. The only letter to Braine from Cole clearly states that Weinstock was denied tenure because her research was subpar. Moreover, even assuming finances played a role in the denial of Weinstock's tenure, such a consideration would be entirely immaterial to this case. Title VII was enacted to combat *discrimination;* it was not designed to conscript courts into the task of reviewing the wisdom of university administrators' fiscal decisions. *See Bickerstaff,* 196 F.3d at 456 (citing cases).

\* \* \* \* \* \*

▆ Notwithstanding the dissent's quixotic efforts to breathe life into this case, we cannot fault the district court for aborting it by granting a motion for summary judgment. The very purpose of summary judgment is to weed out those cases that are destined to be dismissed on a motion for a directed verdict, or as it is now termed, a motion for judgment as a matter of law. *See* Fed.R.Civ.P. 50(a). Plaintiff would have us follow the advice of David Copperfield's mentor, the amicable Mr. Micawber, and let matters proceed in

the hope that "something will turn up." This notion is inconsistent with the text and policy behind Rule 56 of the Federal Rules of Civil Procedure, which was intended to prevent such calendar profligacy.

 Weinstock has failed to produce " 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].' " *Van Zant*, 80 F.3d at 714; *see also Reeves*, —— U.S. at ——————, 120 S.Ct. at 2108–09. For this and the foregoing reasons, the district court correctly granted Columbia's motion for summary judgment and dismissed Weinstock's complaint. Hope alone cannot raise a triable issue.

## CONCLUSION

We have considered the appellant's remaining contentions and find them to be without merit. Accordingly, we AFFIRM the grant of appellee's motion for summary judgment.

CARDAMONE, Circuit Judge, Dissenting:

After learning in May 1993 that she had been denied tenure at Barnard College where she had taught as an assistant professor in the Chemistry Department for eight years, plaintiff Shelley Weinstock filed a Title VII complaint against defendant Columbia University asserting that the denial of tenure discriminated against her on account of her sex. From the district court's grant of summary judgment in favor of Columbia dismissing her complaint, plaintiff appeals. The majority has voted to affirm the judgment of the district court. Respectfully, I dissent and vote to reverse the grant of summary judgment. I would permit the case to go to trial so that plaintiff might have her day in court on the merits of her discrimination claim.

The district court ruled that plaintiff made out a *prima facie* case. That is, as a woman she is a member of a protected class; she is qualified to be a tenured professor; she suffered an adverse employment decision in the denial of tenure; and the circumstances surrounding that denial give rise to an inference of discrimination. The majority accepts the district court's ruling that a *prima facie* case has been stated.

After plaintiff has made out a *prima facie* case the defendant is required to articulate a legitimate, non-discriminatory reason for denying tenure. Here that reason was that plaintiff's scholarship allegedly was not up to defendant's standards. Plaintiff's burden at that point is to come forward with proof that such reason is merely a pretext, and that more likely than not gender discrimination was the real reason.

The district court found that plaintiff failed to come forward with any proof of pretext. The majority could find no error in this conclusion. I think there was error. To avoid dismissal of her civil rights complaint plaintiff need not actually establish pretext. Her burden is only to raise a question of fact as to the validity of the reason proffered by defendant for its adverse employment decision. In this dissent, I hope to demonstrate that this record abundantly reveals material questions of fact regarding both pretext and whether defendant's decision resulted from sex discrimination.

Professor Weinstock, a woman science professor in a field dominated by men, was turned down for tenure at Barnard College by defendant Columbia University, acting through its provost in whom it vested vast discretion in tenure matters. From the start the provost had a negative view of Weinstock's candidacy. He took actions that violated both the letter and the spirit of Columbia's affiliation agreement with Barnard—an agreement executed to ensure fairness to Barnard in tenure matters. Despite the unanimous support for

tenure of those most familiar with Weinstock's scholarship, namely her peers in the Chemistry Departments of Columbia and Barnard, the provost, who had no expertise in the field and had not read any of her publications, single-handedly denied her tenure, stating that, in his view, her scholarship was not up to Columbia's standards. From this it is fair to say that the provost evaluated plaintiff's candidacy for tenure through a gender-tainted lens, failing to recognize that his vast discretion did not permit him to violate the affiliation agreement, or to trample on the law forbidding discrimination on account of sex that Congress in 1964 enacted as Title VII of the Civil Rights Act. In particular, this record is marked by numerous contradictions and irregularities in the conduct of and rationales offered by Provost Jonathan Cole, the principal actor in this tenure decision. These inconsistencies are inexplicable in the absence of gender discrimination.

## I BACKGROUND

### A. *Relationship Between Columbia and Barnard*

To fully explain the grounds on which I dissent, it is important to understand the relationship between Barnard, the college where Professor Weinstock sought tenure, and defendant Columbia University.

Barnard College and Columbia University are parties to a written affiliation agreement that requires Columbia's approval of tenure for Barnard faculty. The agreement requires that Barnard appoint faculty of comparable quality to Columbia and that there be a regular system for reviewing Barnard candidates for tenure. Yet, the University agrees that the procedures for Barnard candidates are not identical to those for Columbia candidates, and that this distinction is to ensure fairness to Barnard. Although the tenure review process embodies the same standards and provides for regular review, it recognizes the differences in the mission between Barnard College and Columbia University.

Barnard is a small, undergraduate, women's liberal arts college of several thousand students (this year's graduating class was about 570), while Columbia is a large, internationally known research university, teaching graduate as well as undergraduate students. Resources for research at the smaller College are more limited than at the University, which is a reason why "the procedures by which Barnard nominations [for tenure] are reviewed differ in some respects" under the agreement between the University and Barnard. Because there are no graduate students to assist in research and the research budget and facilities are more limited than at the larger University, the projects undertaken by Barnard professors in the Chemistry Department are necessarily narrower than those at the University. Thus, although the affiliation agreement states that faculty at Barnard and Columbia are to be of comparable quality, the more limited resources at Barnard require that the standards for tenure at the two institutions differ. This crucial difference is explored below.

### B. *Columbia's Record in "Natural Sciences"—Statistics*

Statistical evidence puts this matter in further perspective and makes plain how the University deviated from the standards it had agreed to abide by. Although not in the record before us, Columbia makes statistical information on its hiring patterns freely and widely available. *See Office of Equal Opportunity and Affirmative Action* (visited Aug. 8, 2000) <http://www.columbia.edu/cu/vpaa/eoaa/index.html>. Even though Columbia established a 33 percent hiring goal for women in the natural sciences in 1996–97, of the five new hires that year, none were women. Such disparity cannot

be explained by a lack of women graduate students in scientific fields since women earned 45 percent of all doctorates awarded in life sciences (which includes biochemistry, Weinstock's field) in 1997; nor can it be explained by a restricted pipeline of candidates since even in 1987 women obtained 35 percent of all life science doctorates nationwide.

In fact, in the natural sciences (often known as "hard sciences"), where plaintiff teaches, only 15 percent of professors at Columbia were women. In over forty years, only two women have ever been tenured in Columbia's Chemistry Department, and the department has never had more than one woman tenured at a time. Columbia's record cannot be explained by supply and demand—the number of women obtaining doctorates and entering the academic job market in science has risen dramatically over the last decade. One Columbia professor characterized this abysmal record as a "scandal." The 15 percent women professors in natural sciences has held steady for the past 12 years, the same length of time the provost who made this tenure decision has held office. Statistical disparities like these are probative on the issue of discrimination because they are often the only way to demonstrate covert discrimination. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

## C. *Plaintiff's Candidacy*

Next we look at plaintiff's background. Weinstock was an assistant professor in the Chemistry Department at Barnard for nine years from 1985 to 1994 when, after she was denied tenure, her employment was terminated. She is a biochemist whose research focused primarily on blood substitutes and artificial organs. Weinstock was educated at MIT and Harvard, published scholarly works in academic publications and received prestigious grants, including one from the National Institutes of Health, which funds less than 10 percent of all applications. Because the award of such a grant is highly selective it shows that she ranked near the top of her national peer group. In her tenure application, Weinstock received the unanimous support of the Barnard Chemistry Department. The Columbia Chemistry Department voted for plaintiff's tenure with not a single negative vote. The Barnard Committee for Tenure voted in her favor, and the president of Barnard favored granting plaintiff tenure. Weinstock's tenure dossier was extremely strong, containing excellent referee letters from leading scientists in her field. She was widely lauded as an excellent teacher and mentor.

## II Provost Cole and the *Ad Hoc* Committee

### A. *Cole's Conduct*

Following the approval of the Chemistry Departments of Barnard and Columbia and the other approvals already recited, Professor Weinstock's application was turned over to Columbia Provost Cole, who, as provided for in the affiliation agreement, selected an *ad hoc* committee of five: two from Columbia (Professors Tall and Silverstein), two from Barnard (Professors Braine and Hertz), and one outside member having no affiliation with Barnard or Columbia (Professor Cohn of Rockefeller University). The *ad hoc* committee serves as an independent, objective body to evaluate tenure candidates.

The two Columbia professors Cole appointed to the *ad hoc*, Alan Tall and Samuel Silverstein, were both from the medical school. Cole had known both professors for several years and with Silverstein shared a common interest in the "sociology of science," an area in which Cole has published several books.

As Chair of the *ad hoc* committee, Cole's other Columbia appointee, Professor Tall, called each of the *ad hoc* members before the committee convened and expressed criticism of Weinstock's candidacy. Tall admitted he called to express "his concerns." The majority dismisses these phone calls as "protocol," yet testimony from Lila Braine and Paul Hertz, the two Barnard professors on the committee,

makes it very clear that Tall was not calling to schedule a convenient meeting time, inquiring about information perhaps missing from the dossier distributed to all members in advance, or attending to any other matters falling within the scope of such administrative "protocol."

Indeed, Braine testified that Tall was trying to "twist her arm" with his negative views of Weinstock. Both Braine and Hertz were so disturbed by the nature of Tall's phone calls that independently of each other they reported the phone calls to Robert McCaughey, the Dean of Barnard's Arts and Sciences faculty, who was to be present at the *ad hoc.* Columbia's then-President Michael Sovern, its current President George Rupp, Barnard's then-President Ellen Futter, and even Cole himself all agree that these phone calls would have been clearly "inappropriate" if Tall were expressing an opinion on Weinstock's candidacy, and would have constituted a procedural irregularity, because, according to Columbia's president, members of an *ad hoc* committee are to meet after reviewing the candidate's dossier "completely independently."

Yet when Dean McCaughey raised the issue at the *ad hoc* and requested that a new *ad hoc* be convened, Provost Cole dismissed his request, claiming that because neither Braine nor Hertz felt their opinions had changed as a result of Tall's phone calls, there was no procedural irregularity. Replicating Cole's argument, the majority finds that "whatever irregularities existed did not affect the final decision to deny Weinstock tenure." Whether Tall's arm-twisting was ultimately successful is irrelevant to the issue of gender discrimination. The very fact that the calls were made, that they were clearly inappropriate, and as such constituted procedural defects in the tenure review process, calls into question Columbia's proffered nondiscriminatory reason for de-

nying Weinstock tenure. (issue # 1) This evidence raises the first of 12 disputed questions of fact that I identify. Many of them relate to Cole's credibility. All of them are material to the issues of pretext and discrimination. At this stage of the case, all of these issues should have been resolved in plaintiff's favor.

Moreover, at the *ad hoc* deliberations, evidence of gender discrimination began to surface. Barnard Professors Braine and Hertz observed that Columbia Professors Silverstein and Tall, who had never met Weinstock, referred to her by her first name, "Shelley." Referring to a woman by her first name in this context may be probative on the issue of gender discrimination. Amici,[1] quoting an article from the *Yale Journal of Law and Feminism,* report that in 1,730 student evaluations of law school faculty, male professors were never referred to by their first names. Braine and Hertz also testified that Silverstein and Tall assumed a patronizing tone toward Weinstock, calling her "nice" and describing her as if she were nurturing. Although they do not specifically remember what words were used to describe Weinstock, they both believe that "nurturing" was consistent with the nature of Silverstein's and Tall's commentary.

The majority finds, as a matter of law, that these comments cannot possibly raise an inference of sex discrimination because "nice" and "nurturing" could: (1) conceivably be used to describe men, and (2) are positive qualities. Perhaps these are positive qualities in a motherhood contest, but during the tenure deliberations for a chemistry professor and scientist, they suggest gender discrimination. By describing her as "nice" and referring to her nurturing manner, Silverstein and Tall were not extolling her positive qualities—rather, they were using these qualities to highlight what they perceived to be her intellectual weakness.

---

1. A brief *Amici Curiae* was filed in this appeal jointly by Equal Rights Advocates, American Association of University Women, Association for Women in Science, and New York Chapter of the National Employment Lawyers Association.

At the *ad hoc* meeting the Barnard dean and Columbia provost are both present, supposedly as observers. But the provost took an active role and expressed a negative view of Weinstock and her chemistry research, a field in which he had no expertise. Cole admitted he had not read a single one of her many publications. Significantly, he denied in his deposition having expressed any opinion at the *ad hoc* meeting at all, yet three members of the committee who were present, including outside Professor Cohn, say Cole took an active role and was negative (Professor Cohn said the "sticking point" for Cole was Professor Weinstock's research). (issue #2)

The provost informed the members of the *ad hoc* committee that plaintiff should be judged as though she would receive tenure at Columbia, a standard that had not been applied to other Barnard candidates. According to the affiliation agreement between the two institutions, the procedures by which Barnard nominations for tenure are reviewed "differ in some respects" from Columbia nominations. The differences between the two institutions render the provost's purported standard a false and impossible one. (issue #3)

Provost Cole's predisposition against Professor Weinstock, evidenced by his active and deliberate role during the *ad hoc*, could explain why remarkably he sent Barnard College a letter stating that he agreed with the *ad hoc*'s decision to *deny* Weinstock tenure and was thus denying her tenure. He generated this very important document despite the fact that the *ad hoc* committee had voted to *grant* plaintiff tenure. Alerted to his glaring error, Cole sent a follow-up letter to Barnard College, explaining that he had sought "additional information" after the *ad hoc* voted in her favor, which had convinced him to reject its recommendation. (issue #4)

The process by which Provost Cole collected his purported "additional information" is equally mendacious. He asked Associate Provost Stephen Rittenberg to compile a list of experts in Weinstock's field to consult about her candidacy. Although Rittenberg provided him with a list of expert faculty within Columbia University, Cole did not contact a single person on this list. Rather, he turned to Breslow and Bersohn, two professors in Columbia's Chemistry Department, neither of whom are experts in Weinstock's field. Professor Breslow had previously written a thoughtful letter supporting plaintiff's candidacy, but changed his tune in response to the provost, describing Weinstock as not aggressive, not tough, a "perfectly nice person" and a "pushover." Having obtained from Professor Breslow what he wanted, the provost then cited Breslow's advice in support of his decision to turn plaintiff's tenure application down. (issue #5)

When questioned during his deposition on why he did not contact any of the experts knowledgeable about Weinstock's area of research, Cole responded that he sought only to *"confirm" his assessment of Weinstock* and therefore did not need to consult an expert. His own notes of his conversation with Breslow are telling in that they touch only briefly on the supposedly central issue—the strength of Weinstock's research—but instead go on to describe personal characteristics, *i.e.*, a "perfectly nice person," a "pushover." Cole found the confirmation he needed—confirmation of gender stereotypes that detracted from Weinstock's scholarly achievements. (issue #6)

In addition, from his conversation with Bersohn, Cole discredited the positive recommendation of Columbia's Chemistry Department, by describing it as a "courtesy" extended to Barnard. If the sincerity of the Columbia Chemistry Department's letter favoring Weinstock's tenure was ambiguous, the affiliation agreement sets forth formalized procedures for exploring its meaning, either through a written statement to the *ad hoc*, or by testimony before it. Neither option was followed. In light of the fact that Weinstock received

11 votes from Columbia's Chemistry Department in her favor, 4 abstentions from those unfamiliar with her research, and not a single negative vote, Cole's assertion that the recommendation was extended as a mere "courtesy" is to say the least, somewhat startling. The majority's assertion that this vote *"was* a mere 'courtesy'"* at best raises a dispute about a material issue of fact. (issue # 7)

Moreover, in assessing the credibility of Cole's reliance on two supposedly negative reports from members of the Columbia Chemistry Department, Weinstock is entitled to the inference from the departmental vote that either (a) Breslow and Bersohn thought well enough of her work to vote to tenure her; or (b) they were among those abstaining because they were unfamiliar with her work. Either inference casts doubt on the validity of Cole's reason. (issue # 8)

Even when the *ad hoc*'s vote is 3–2, it is rare for the provost to reject its recommendation. To justify, at least in part, taking the "rare" action of overruling a positive *ad hoc* committee vote, Cole in his report to the president of Columbia said that Rockefeller University's Professor Cohn—the only member of the *ad hoc* committee who was in plaintiff's field—thought Weinstock's research was "weak." Yet, according to two of the *ad hoc* members, Professor Cohn was positive about plaintiff's candidacy. In fact, in Professor Cohn's own letter to the Chair of Barnard's Chemistry Department following the denial of tenure, he expressed his unhappiness at Cole's decision to deny Weinstock tenure, stated that he had voted in her favor and had found her research "rather imaginative," and commented that she was an excellent teacher and mentor. Hardly the language used to describe a weak candidate. (issue # 9)

Further, the affiliation agreement provided that the provost was to explain the reasons for his decision to the *ad hoc* whose recommendation he rejected. Cole offered none. After Barnard Professor

Braine wrote two letters requesting an explanation, Cole finally answered, but qualified his response by stating that since Weinstock had filed a charge of discrimination with the EEOC, any explanation he offered must be made with the defense of Columbia University in mind. One might fairly ask what defense would be needed if the reason given was not pretextual. (issue # 10)

### B. *Cole's Rationale*

For the reader to place Cole's conduct in proper context, some insight into his initial negative view of plaintiff as a woman candidate for tenure in the Chemistry Department can be gained by examining a book he wrote on this subject, *Fair Science: Women in the Scientific Community* (1979). In the book Provost Cole addresses the question of whether women scientists are subject to sex discrimination in matters of promotion. *Id.* at 13. His answer, set forth in chapter 3, *Woman's Place in the Scientific Community*, is "no." Instead, he believes there is a high degree of fairness in the distribution of scientific rewards and that women's lack of success is based on what he terms "universalistic criteria," which, at page 5, he defines as merit. *See id.* at 82. To put it bluntly, a rational juror could find that in the provost's view, women scientists are *not* subject to discrimination in denial of tenure cases; they simply lack merit.

Faced with such a strong tenure candidate, Cole explained his decision by insisting that Weinstock fell short of the standard needed to obtain tenure in Columbia's Chemistry Department, rather than Barnard's Chemistry Department. This rationale enabled him to mischaracterize all the positive reviews of her work, including Professor Cohn's, by insisting that these reviewers were only positive about Weinstock because they applied a lower standard. It is nonetheless clear from the affiliation agreement that the standards for tenure at Barnard, a small undergraduate institution with limit-

ed research facilities, differ from those at Columbia, a large research institution with advanced facilities and a substantial budget and graduate students to assist professors in their research. There is ample evidence to indicate that as a practical matter, two standards, one for tenure at Barnard and one for tenure at Columbia, had emerged. President Futter of Barnard appealed Cole's decision in writing—the first time she had ever appealed a tenure decision in her 12 years as Barnard's president. In his defense, Cole cited the affiliation agreement, arguing that it permitted him to apply identical standards to Barnard and Columbia professors, and that his broad discretion rendered his decision unreviewable.

Cole's nondiscriminatory rationale is from start to finish incredible. Even Professor Breslow, whose testimony he cites in support of his decision, agreed that Sally Chapman, the Chair of Barnard's Chemistry Department, would not have been granted tenure under the standard Cole claimed to impose on candidate Weinstock. Professor Weinstock was the first woman nominated for tenure in the natural sciences at Columbia or Barnard during Cole's term as provost, and it is apparent that Cole selectively applied a higher standard in her case. The tenure bar was raised for Weinstock because she is a woman. This point was made crystal clear the following year when a male professor in the Physics Department was granted tenure at Barnard despite the fact that at least one member of his *ad hoc* committee *acknowledged* that he would not have received tenure in the Physics Department at Columbia. That is, the tenure bar was lowered for a man. (issue # 11) Standing alone this issue is significant enough to overcome a summary judgment motion.

Even Provost Cole's response to Professor Braine's letter inquiring as to his reasons for denying Weinstock tenure was suspect. Cole insisted that as provost he had to be concerned about the financial impact of tenure on University finances.

That statement is inaccurate and disingenuous. The affiliation agreement with Columbia leaves the qualifications review up to the agreed-upon *ad hoc* process, but with respect to financial considerations, Barnard's decision is "final," as the president of Columbia conceded. (issue # 12)

This record reflects gender discrimination incontrovertibly shown by gender stereotyping and by statistics. Further this discrimination occurred under the aegis of a provost granted vast discretion in tenure matters who, the record demonstrates, was guilty of procedural irregularities in violation of the affiliation agreement between Columbia and Barnard, as well as a very large number of credibility issues that cast doubt on the provost's veracity as a witness. In light of this evidence, a reasonable jury could find that the proffered reason for denial of tenure was pretextual, and that the real reason was sex discrimination in violation of Title VII.

### III Law

#### A. *Summary Judgment*

In their zeal to "clear the calendar" of so-called "doomed lawsuits," my colleagues have overlooked the procedural posture of Weinstock's appeal. Summary judgment is appropriate only when the moving party has shown that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). In determining whether genuine issues of material fact exist, "a court must resolve all ambiguities and draw all reasonable inferences *against* the moving party.... [N]ot only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them." *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987) (emphasis added).

In reviewing the facts of this case, the district court and the majority have done the precise opposite—resolved factual issues in Columbia's favor rather than Wein-

stock's, and disregarded the controversy surrounding 12 of its pivotal facts. These analytical errors are particularly egregious in a discrimination case, where an employer's intent is at issue. As we have repeatedly recognized, evidence of discriminatory intent is usually circumstantial and can only be gleaned from careful scrutiny of the entire record. *See, e.g., Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir. 1999) ("[T]he trial court must be especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination."); *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996) ("Since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant depositions, affidavits and materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination."); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994) (explaining that court must be cautious about using this "drastic provisional remedy" where "intent is at issue").

### B. Substantive Law on Discrimination—Factors Bearing on Pretext

1. *Gender Stereotyping.* The discriminatory effect of gender stereotypes is precisely the problem the Supreme Court condemned in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). The majority believes *Price Waterhouse* is inapplicable to this case because unlike Ann Hopkins, who was advised to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled and wear jewelry," *id.* at 235, 109 S.Ct. 1775, Weinstock did not face "carping." This logic misapprehends why stereotyping is discriminatory. The irony of *Price Water-*

*house* arose from the fact that Hopkins' so-called masculine qualities—what others perceived as her abrasiveness—would have been valued qualities in a man being considered for partnership. Price Waterhouse discriminated against Hopkins because although she performed the "masculine" role of competing successfully for business, the firm punished her for not *simultaneously* performing the "feminine" role of speaking softly and having a feminine appearance. The Supreme Court held that Hopkins' failure to fulfill this gendered role was an impermissible consideration in the partnership decision.

This case presents the mirror image of *Price Waterhouse.* Cole's decision to deny Weinstock tenure was based—ironically—on her perceived *success* at projecting a stereotypically "feminine" image at work. Weinstock was described as gentle and caring, "nice," a "pushover," and nurturing. Unfortunately for Weinstock, a stereotypically "feminine" person is not viewed in a male dominated field as a driven, scientifically-minded, competitive academic researcher. The inappropriate focus on Weinstock's "feminine" qualities in the tenure process led Cole and perhaps others to discount her "masculine" success as a researcher and professor. While Hopkins was punished for failing to perform a "feminine" role, Weinstock was punished for performing it too well.

The problem both Weinstock and Hopkins faced is that their employers demanded that they perform both "masculine" and "feminine" roles, yet perceived those roles as fundamentally incompatible. Unlike "masculine" men at *Price Waterhouse,* Hopkins was punished because her "masculinity" appeared inconsistent with gendered stereotypes of how women should look and behave; Weinstock was punished because her "femininity" appeared inconsistent with "masculine" success as a researcher. Yet if Weinstock had chosen to project a more "masculine" image, she

could very well have · suffered the same fate as Hopkins.

2. *Procedural Irregularities.* In the instant case, Weinstock has raised significant questions about Columbia's proffered nondiscriminatory reason for its tenure decision—more than enough evidence to overcome a motion for summary judgment. In any other employment setting, the procedural irregularities and shifting standards outlined earlier that characterized the entire process of Weinstock's tenure review, would undeniably suggest pretext. *See DeMarco v. Holy Cross High Sch.,* 4 F.3d 166, 171 (2d Cir.1993) (implausibility of employer's nondiscriminatory rationale shows pretext); *Schmitz .v. St. Regis Paper Co.,* 811 F.2d 131, 132–33 (2d Cir.1987) (employer shifting explanations provides evidence of pretext). The context of a tenure decision is no different, as Title VII applies with the same force to universities as to all employers. *University of Pa. v. EEOC,* 493 U.S. 182, 190–91, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990).

In fact, we have held that procedural irregularities can create an inference of discrimination in tenure decisions. *See Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 313 (2d Cir.1997) (reversing summary judgment where procedural irregularities raised inference that reasons given for employment decision were not the real reasons); *Zahorik v. Cornell Univ.,* 729 F.2d 85, 93 (2d Cir.1984) (procedural irregularities can raise an inference of bias). Whether the affiliation agreement gave Cole the power to reject unilaterally the *ad hoc*'s tenure recommendation has no bearing on whether he exercised that discretion in a discriminatory fashion. The discretion accorded to Cole as university provost does not place his actions above the law.

In addition to the ample evidence of pretext plaintiff has offered, the facts in this case also create an inference of sex discrimination, suggesting that Weinstock might well have ultimately prevailed had she been given her day in court. In any other employment setting, the use of gendered stereotypes suggests sex discrimination. It is not necessary that these stereotypes form the sole basis for an employer's decision. Weinstock need only show that her gender was a "motivating factor" in Columbia's decision. *See Price Waterhouse,* 490 U.S. at 250, 109 S.Ct. 1775; *Renz v. Grey Advertising, Inc.,* 135 F.3d 217, 221–22 (2d Cir.1997); *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 105 (2d Cir.1989). When this strong evidence of pretext is considered in the context of gender stereotypes evident in Columbia's handling of Weinstock's tenure case, it creates an inference of sex discrimination, suggesting that Weinstock might well have ultimately prevailed had she been given her day in court. *See Reeves v. Sanderson Plumbing Products,* —— U.S. ——, ——, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000). In holding that evidence of pretext, when combined with a *prima facie* case could, as a matter of law, support a jury's finding of discrimination, the Supreme Court in *Reeves* clarified what circumstances might make that showing insufficient: "An employer would be entitled to judgment as a matter of law if *the record conclusively revealed* some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was *abundant and uncontroverted independent evidence* that no discrimination had occurred." *Id.* at ——, 120 S.Ct. at 2109 (emphases added). Thus, to overcome as a matter of law a finding of discrimination based on pretext plus a *prima facie* case, a defendant must point to evidence in the record clearly indicating that for some reason, plaintiff's evidence of pretext in that particular case should not carry the weight normally assigned to it under general principles of evidence law. *See Reeves,* —— U.S. at ——, 120 S.Ct. at 2108 (relying on "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a

material fact as 'affirmative evidence of guilt.' ") (quoting *Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992)). In the case before us, Weinstock has raised material issues of fact on pretext sufficient for a rational jury to find in her favor. Columbia points to no reason why all rational factfinders would necessarily discount that evidence of pretext. That is, Columbia has not produced the strong, independent evidence of a third motive or alternative rationale that *Reeves* requires to overcome a plaintiff's proof of pretext and prevail as a matter of law. In this regard, Weinstock has more than met her burden to obtain a trial on the merits.

3. *Statistical Proof.* In addition, Columbia's abysmal record of promoting women professors in the hard sciences is probative evidence on the issue of sex discrimination. An employer's poor record of hiring and promoting members of a protected class can often provide statistical evidence of discrimination under Title VII, *see International Bh'd of Teamsters v. United States*, 431 U.S. 324, 335 & n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and can at times, even standing alone, constitute a *prima facie* case of discrimination. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Hazelwood Sch. Dist.*, 433 U.S. at 307–08, 97 S.Ct. 2736; *Teamsters*, 431 U.S. at 339, 97 S.Ct. 1843.

## CONCLUSION

The ultimate question we have to answer is *not* whether Provost Cole's conduct violated the letter and the spirit of the affiliation agreement between Barnard and Columbia—which it so obviously did—it is whether Cole's actions violated federal and state anti-discrimination laws. The record suggests that Weinstock was denied tenure not because her scholarship was lacking, as Columbia insists, but because she is a woman. The magnitude of the proof Weinstock offered—reflected in the 12 issues identified above—raises significant, material issues of fact with respect to pre-

text that cast doubt on Columbia's purported nondiscriminatory reason for denying her tenure. Were a jury to believe that Columbia has falsely manufactured its reasons for denying plaintiff tenure as a chemistry professor at Barnard—particularly where that disbelief is accompanied by a suspicion of mendacity—that disbelief together with the elements of plaintiff's *prima facie* case already conceded may be sufficient to prove unlawful discrimination at trial. *See Reeves*, —— U.S. at —— – ——, 120 S.Ct. at 2101–02; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 & n. 4, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *Reeves*, which held that a *prima facie* case, combined with proof of pretext can, as a matter of law, sufficiently support a jury's finding of discrimination, makes clear that a plaintiff, by showing a material question of fact with regard to pretext, logically defeats a motion for summary judgment.

Although broad discretion did rest in the provost, it is limited by the agreement with Barnard and by the bounds of Title VII law. For that reason, his discretion did not constitute him, as he appeared to think, a law unto himself. The sad irony here is that this fabled University, the oldest college in New York State and the fifth oldest in the nation, and a leading voice for fair and equal rights for women, could continue to countenance for such a prolonged time, a disgraceful record of discrimination against women pursuing academic preferment in the natural sciences, a record that culminates in this case.

Columbia's success in depriving its sister college of Professor Weinstock's services in its Chemistry Department and in having this Court vindicate that decision, must, at some level, be viewed as a victory for Columbia and its provost. But at what price?