James H. MURUNGI, Plaintiff,

v.

UNITED STATES OF AMERICA DEPARTMENT OF VETERANS AFFAIRS, Defendant.

No. 99–CV–6046L.

United States District Court, W.D. New York.

Feb. 8, 2001.

155

Theodore S. Kantor, Bilgore, Reich, Levine, Kroll & Kantor, Rochester, NY, for plaintiff.

Brian M. McCarthy, United States Attorney, Rochester, NY, for defendant.

## DECISION AND ORDER
LARIMER, Chief Judge.

### INTRODUCTION

Plaintiff, James H. Murungi ("Murungi"), a black male originally from Kenya, was employed as a clinical pharmacist by the Veterans Administration ("VA"). He began working at the VA Rochester Outpatient Clinic ("Rochester") in December of 1994 and was terminated on September 4, 1998. Plaintiff maintains that his supervisors at the VA discriminated against him on account of his race. Specifically, plaintiff alleges that he was subjected to a hostile work environment and that the VA twice failed to promote him, then demoted him, and ultimately terminated him. Moreover, plaintiff alleges that the VA retaliated against him for complaining about his working conditions.

Plaintiff initiated this action alleging, *inter alia*, violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Pending before this Court is defendant's motion for summary judgment as to the second cause of action, the Title VII claim. Defendant also filed a motion to dismiss the remaining causes of action, which plaintiff has not opposed.[1]

### FACTUAL BACKGROUND

The Rochester facility is part of the Veterans Integrated Service Network 2 ("VISN 2"), which includes facilities in Buffalo; Batavia; Bath; Canandaigua; Syracuse; and Albany, New York. Before plaintiff began his tenure with the VA,

Rochester was affiliated with the Buffalo VA Medical Center ("Buffalo"). As a result, the Rochester pharmacy was supervised by Buffalo personnel. Plaintiff was hired by George Jones ("Jones"), the Buffalo pharmacy manager, who is black. Jones retired in January of 1997, and Theodore Pudhorodsky ("Pudhorodsky"), who is white, took over Jones's position. Plaintiff alleges that the discriminatory conduct began after Jones retired.

Starting in April of 1997, Rochester began the process of affiliating with the VA Medical Center in Canandaigua ("Canandaigua"). Until shortly after plaintiff's termination in September of 1998, Buffalo and Canandaigua shared oversight of Rochester. At the time of his termination, plaintiff was the only black individual working at Rochester.

### DISCUSSION

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under Rule 56(e), a party opposing the motion for summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial."[2] "Summary judg-

---

1. The remaining causes of action include alleged violations of the Fifth and Fourteenth Amendments (first cause of action); 42 U.S.C. §§ 1981 & 1983; negligent or intentional infliction of emotional distress; libel and slander; and assault, battery, false imprisonment, and the destruction of property (third through sixth causes of action).

2. Plaintiff's papers simply "incorporate by reference" his 354 page deposition, submitted as an exhibit to defendant's motion. Although the Court has reviewed plaintiff's deposition, plaintiff has made no reference to the portions of this deposition on which he seeks to rely. In fact, plaintiff's papers submitted in opposition to defendant's summary

ment is appropriate even in discrimination cases, for .... 'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000)(quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985)).

## A. Hostile Work Environment

In order to succeed in a Title VII hostile work environment claim, "a plaintiff must demonstrate: '(1) that his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)(citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996))(alterations omitted). The conduct in question must be "so 'severe or pervasive' as to create an 'objectively hostile or abusive work environment,'" and it must be such that ."the victim 'subjectively perceive[s] the environment to be abusive.'" *Richardson v. N.Y. State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir.1999)(alteration in original)(quoting *Harris v. Forklift Systems*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

Here, plaintiff's subjective belief has not been called into question. What is challenged, however, is the objective nature of the working environment. The Court must, therefore, determine whether plaintiff's working environment was such that "a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." *Id.*

At the outset, it should be noted that plaintiff does not advance a separate hostile work environment cause of action in his complaint. Although plaintiff's complaint and affidavit in opposition to the motion for summary judgment use the phrase "hostile work environment," plaintiff has made little effort to show that his workplace was pervaded with the necessary level of discriminatory intimidation. The record here contains no evidence of racial epithets. Moreover, plaintiff has offered no evidence, other than his own conclusory opinion, that the complained of conduct was, in fact, based on plaintiff's race or ethnicity.[3] Plaintiff appears con-

judgment motion do not contain a single citation or reference to this deposition. Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admission on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(emphasis added). This Court "is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Barge v. Anheuser–Busch, Inc.*, 87 F.3d 256, 260 (8th Cir.1996)(quoting *White v. McDonnell Douglas Corp.*, 904 F.2d 456 (8th Cir.

1990)); *see St. George v. Mak*, 2000 WL 303249, at *1 (D.Conn. Feb. 15, 2000)("The Court is not required to scour the record or the parties' various submissions to piece together appropriate arguments.").

3. In his Memorandum of Law and in his affidavit, plaintiff also "summarizes" the deposition testimony of several VA employees. In general, these employees testified as to Murungi's good character. The portions of their testimony attached to plaintiff's affidavit can fairly be described as sympathetic to plaintiff. Both Arun Sangave ("Sangave") and Dr. Savita Puri suggested that plaintiff had expressed to them his belief that he was being discriminated against. However, none of these individuals described any specific dis-

vinced that any negative comment must, because he is black, be race-based. For example, plaintiff was asked during his deposition whether anyone ever used derogatory racial terms in his presence. He suggested that such terms had been used. *See* Murungi Deposition, p. 78. However, the only example he offered was that Pudhorodsky told him on several occasions that: "You are not as good as you think you are." [4] *Id.* at pp. 79–80. Although critical of Murungi, such a comment appears to be quite neutral in terms of race. Plaintiff also noted that Kenneth Kellick ("Kellick"), the Clinical Pharmacy Coordinator at Buffalo, questioned his researching ability. According to plaintiff, this comment must also have related to his race or ethnicity because plaintiff was a skilled researcher, and Kellick must have been questioning his competency simply because of his race. *Id.* at 80. Every critical comment does not become discriminatory simply because the recipient disagrees with its content.[5]

Plaintiff also alleges that he was subjected to physical violence in the workplace. He states generally that Pudhorodsky "physically attacked" and "falsely imprisoned" him on October 23, 1997, that he was humiliated, and that he feared for his safety. Murungi Affidavit, ¶¶ 19, 30–31. Plaintiff has once again failed to illustrate how this confrontation was in any way racially motivated. In fact, plaintiff's papers scarcely explain what occurred during this alleged assault.

Pudhorodsky maintains that, on the day in question, plaintiff started to leave the pharmacy, apparently to see a patient. *See* Pudhorodsky Affidavit, ¶ 22. Because plaintiff was scheduled to work in the pharmacy at that time, Pudhorodsky twice asked plaintiff where he was going, and plaintiff refused to respond. Murungi, in his submission to this Court, has not refuted this version of the events. According to Pudhorodsky, he then grabbed the door knob and again asked where plaintiff was going. Plaintiff told Pudhorodsky that he was going to see a patient. Pudhorodsky released the door knob, and plaintiff left.

Viewing the facts in a light most favorable to plaintiff, it appears that this "assault" consisted of Pudhorodsky's challenging plaintiff about leaving the pharmacy and his briefly preventing plaintiff from exiting the pharmacy area. At most, Pudhorodsky pushed plaintiff during the altercation. *See* Murungi Deposition, p. 172.

criminatory conduct that was directed at plaintiff. For example, Sangave, a staff pharmacist at Rochester, was asked by plaintiff's counsel if Murungi ever told him that he was being treated differently. Sangave replied, in part: "His level is totally different than what mine is. So naturally ... if he's asked to do my function naturally he's being discriminated. [sic] You don't have to be a rocket scientist to figure it out." Sangave Deposition, p. 24. When asked why he thought Murungi was discriminated against, Sangave replied that he did not know. *Id.*

4. Later, in his affidavit in opposition to defendant's summary judgment motion, plaintiff attributes this comment to both Pudhorodsky and Kenneth Kellick and suggests that both men insulted him in this manner "constantly.

... whenever they came to the Rochester clinic." Murungi Affidavit, ¶ 35.

5. Plaintiff also makes the generic allegation that he "was generally humiliated in public by reason of [his] national heritage and minority background." Murungi Affidavit, ¶ 33. Such conclusory allegations cannot withstand a motion for summary judgment. *See, e.g. Abouzied v. Saleh Montaser Jr. H.S. No. 78,* 2000 WL 1276635, at *5 (E.D.N.Y. Aug. 30, 2000)(conclusory allegations insufficient to support prima facie case of hostile work environment); *Adeniji v. Administration for Children's Servs., NYC,* 43 F.Supp.2d 407, 423 (S.D.N.Y.)(conclusory allegations inadequate to support hostile work environment claim) *aff'd,* 201 F.3d 430 (2d Cir.1999).

Again, although this altercation may have been unpleasant, plaintiff has made no attempt to explain how this exchange was related to his race.

Additionally, plaintiff alleges that he was subjected to physical violence at the hands of Kerry Grant ("Grant"), the Medical Surgical Ambulatory Care Line Manager at Canandaigua, and Rochester staff member Dolores Anzalone ("Anzalone") on June 15, 1998. *See* Murungi Affidavit, ¶ 19. Although once more plaintiff makes little attempt to describe this altercation, the incident apparently occurred when plaintiff was ordered to vacate his office space. As discussed more thoroughly below, following plaintiff's refusal to vacate this space, Grant went into plaintiff's office and attempted to remove some furniture from the room. Plaintiff then jumped onto a desk that Grant was moving, and Grant allegedly continued to push the desk. According to plaintiff, the desk hit the office door and plaintiff's legs were bruised. It is unclear what part Anzalone played in this alleged act of violence. Although plaintiff has generally alleged that he was ordered to vacate his office space because of his race, plaintiff has made no attempt to show how this order or the altercation surrounding his removal had any racial overtones.

Following the June 15, 1998 altercation, plaintiff was allegedly directed to leave the Rochester premises. When he refused, the police were summoned and Murungi was physically removed from the facility. Plaintiff was then suspended. Notices concerning plaintiff were posted on the premises, one of which read "James Murungi, Pharm.D is not allowed on the premises until further notice. Rm. 211 is now assigned to Veterans Benefits Officer." Kantor Affidavit, Ex. C. Plaintiff suggests that through these notices, VA managers sought to label him as "a 'criminal' and had posters with [his] name posted and placed at entrances to and inside [Rochester] stating that [he] was engaging in criminal behavior and was subject to arrest if seen on the premises when such was false and untrue." Murungi Affidavit, ¶ 28. Although plaintiff does not paint a pleasant picture of his workplace, he has again failed to connect these alleged actions to any discriminatory animus.

Plaintiff also complains that he received "poor" performance appraisals as a means of punishment or retaliation.[6] Finally, Murungi cites the failure of his supervisors

---

6. As discussed in the Court's evaluation of plaintiff's retaliation claim below, plaintiff has put forth no evidence to show that he complained about a hostile work environment (or, for that matter, any other type of discrimination) before the alleged retaliatory performance evaluation, which covered the months of April 1, 1996 to March 31, 1997, was completed. Moreover, it is hard to really characterize the evaluation as negative, and it certainly can not be characterized as "hostile." Plaintiff was not found to be deficient in any of the categories addressed in the evaluation. In fact, he was rated "fully successful" in all categories, and was also given an overall rating of "fully successful." *See* Kellick Affidavit, Attachment 2. Furthermore, the subjective comments contained within the evaluation were positive. Plaintiff was described as "an invaluable member of [the Rochester Primary Care] health maintenance team," a "problem solver," and "a valuable reference person for Pharmacy Service." *Id.* Still, the performance appraisal was changed to accommodate plaintiff's objections. Specifically, Pudhorodsky agreed to delete the following language: "When asked to accommodate to changes, Jim is *generally* cooperative, although occasionally resists reorganization." Pudhorodsky Affidavit, ¶ 23 (emphasis in original). Although plaintiff alleges that the discrimination against him essentially began after Jones, his former supervisor, retired, this performance appraisal was completed while Jones was still working at the VA. Such evidence provides little support for plaintiff's hostile work environment claim.

to grant him leave to attend a conference in Tennessee in October 1997. Plaintiff has not put forward any evidence that the "poor" performance appraisal or his supervisors' denial of his request to attend the conference was based on any discriminatory motive.

■ In sum, plaintiff claims that he was subjected to a hostile work environment because: Pudhorodsky and Kellick commented that plaintiff was "not as good as he thought he was," Kellick questioned his ability as a researcher, Pudhorodsky momentarily prevented him from leaving the pharmacy and possibly pushed him, plaintiff's private office was eliminated, his furniture was moved (apparently with plaintiff perched atop), posters denying him admission to the facility were displayed, he received a poor performance appraisal, and he was not permitted to attend a conference.

■ In order to establish a hostile work environment claim, "[t]he conduct must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace." *Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir.1998). It is axiomatic that a plaintiff "must produce evidence that [ ]he was discriminated against because of [his] race." *Richardson*, 180 F.3d at 440. Plaintiff has not demonstrated any issue of material fact which would suggest that the complained of conduct was motivated by any discriminatory intent. *See Narvarte v. Chase Manhattan Bank, N.A.*, 2000 WL 547031, at *10 (S.D.N.Y. May 4, 2000)(Claims of overzealous monitoring of plaintiff's arrival times and negative performance evaluations do not demonstrate discrimination on account of race.); *Murray–Dahnir v. Loews Corp.*, 1999 WL 639699, at *4 (S.D.N.Y. Aug. 23, 1999)(Claims that plaintiff was forced to work longer hours without adequate staff

support and that supervisor "ceased direct communications" and reprimanded plaintiff " 'publicly and unjustifiably' on 'numerous occasions' " failed to establish a hostile work environment claim.). Although plaintiff has suggested several incidents of unprofessional conduct on the part of his supervisors and has portrayed his workplace as uncomfortable and tumultuous, "Title VII is not a 'general civility code.' " *Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir.1999)(citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)), *cert denied*, 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000). While Title VII "protects employees from improper discriminatory intimidation[,] it does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors." *Curtis v. Airborne Freight Corp.*, 87 F.Supp.2d 234, 250 (S.D.N.Y. 2000). Summary judgment in favor of defendant on this claim is granted.

**B. Adverse Employment Actions—Failure to Promote, Demotion, and Termination from Employment.**

Title VII prohibits an employer from discriminating against an employee because of his "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Where, as here, there is "no direct or overt evidence of discriminatory conduct," the Court will evaluate defendant's motion for summary judgment by applying the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Weinstock*, 224 F.3d at 42.

First, plaintiff must set forth a prima facie case of discrimination. Defendant concedes that plaintiff has made such a showing. Next, "the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employ-

ment action." *Weinstock*, 224 F.3d at 42. The burden then shifts to plaintiff to "produce not simply some evidence, but sufficient evidence to support a rational finding that the ... reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Id.* (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996))(internal alterations and quotations omitted).

### 1. Failure to Promote

■ Plaintiff alleges in his complaint that he was twice denied promotions to managerial positions because of his race or ethnicity. Defendant, however, argues that its failure to promote plaintiff was motivated by legitimate, non-discriminatory reasons. Defendant contends that the application process for both positions involved committees that evaluated the candidates and ultimately did not recommend plaintiff. Essentially, defendant maintains that it promoted the most qualified candidates.

In late 1997, plaintiff applied for a Diagnostic and Therapeutic ("D & T") Care Line Manager position at Canandaigua. The individual who currently holds that position, Thomas Wisnieski, describes his responsibilities as "managing the pharmacy, radiology, laboratory, rehab [sic] medicine, chaplain, recreation therapy and prosthetics program" at Rochester and Canandaigua. Wisnieski Affidavit, ¶ 4.

Stuart Collyer, former Director at Canandaigua, described, in an affidavit, the typical application process utilized by the VA for this type of position: 1) the job is posted; 2) applicants submit a package of information; 3) an eight to ten member screening committee is formed, which con-

sists of employees from the hiring care line and employees from other lines, union representatives, employees from different facilities, and the top management from the facility in question; 4) the screening committee reviews the applicants' materials and conducts interviews; 5) the committee makes a recommendation to the Network Care Line Manager; 6) this manager makes the selection. *See* Collyer Affidavit, ¶ 5. The committee interviewed three applicants for the position and eventually recommended Wisnieski, who is white. The committee ranked plaintiff last.

The Network Care Line Manager involved, Donald Cooper, reviewed the documentation submitted by the applicants and considered the screening committee's recommendations. Cooper was not aware of plaintiff's race or national origin when he made the appointment. *See* Cooper Affidavit, ¶ 13. Cooper considered the fact the applicant he chose, Wisnieski, had been placed in the position of D & T Care Line Manager at Canandaigua, on an interim basis, for approximately seven months. *See id.* at ¶ 11. Cooper also weighed the fact that Wisnieski "had the backing of the screening committee, solid management qualifications, expertise and education." *Id.*

Plaintiff had also applied for a pharmacy manager position at the Canandaigua facility that became vacant in September of 1997. Plaintiff and David Robbins, who is white, applied for the position. Wisnieski was responsible for filling it. A three-member committee was assembled to interview candidates and to make a recommendation. Two of the committee members were pharmacists, one from Bath and the other from Canandaigua, and the third member was an occupational therapist. The panel recommended Robbins. Wis-

nieski ultimately selected Robbins[7] based on this recommendation and Robbins's background. According to Wisnieski, Robbins "had been a consulting pharmacist for nursing homes and had managed a retail pharmacy." Wisnieski Affidavit, ¶ 23. Wisnieski also cited Robbins's ability to work with people, and his "solid grounding in the 'nuts and bolts' of dispensing" prescriptions. *Id.* Because Canandaigua was "mostly geared toward the dispensing function," these qualifications made Robbins the more desirable candidate. *Id.*

As described above, defendant has articulated legitimate, non-discriminatory reasons for its decisions not to promote plaintiff. Two separate committees, consisting of different members, recommended someone other than Murungi for each of the vacant positions. There could be no question that the defendant, through its employees, has advanced legitimate non-discriminatory reasons for the employment decisions at issue. Because of that showing by defendant, the burden then shifts to plaintiff to produce evidence to support his claim that the reasons proffered by defendant were pretextual.

Plaintiff, however, has offered no evidence other than his own opinion of his qualifications to suggest that defendant's reasons were false and that the true motivation behind defendant's failure to promote him was discriminatory. In his affidavit, plaintiff simply maintains, in a conclusory fashion, that on these two occasions he was "denied said promotional opportunities and less experienced individuals received the promotion instead of [him]." Murungi Affidavit, ¶ 16. Plaintiff further notes that unlike him, his immediate supervisors and the individuals

promoted did not have doctoral degrees. *Id.* at ¶ 20. Other than touting his educational background, plaintiff has offered no explanation for why these two individuals promoted by defendant were less qualified than he. For example, plaintiff has not shown "that others with equal or less experience were promoted, or that the defendant had a policy of promoting based on anything other than experience." *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 130 (2d Cir.1996). Plaintiff's conclusory opinion that his qualifications were superior is insufficient to establish a material issue of fact. *See Scaria v. Rubin*, 117 F.3d 652, 654–55 (2d Cir.1997)(Despite the fact plaintiff had more schooling, defendants permissibly elected to value experience over education); *Holt*, 95 F.3d at 130 (Plaintiff cannot show pretext simply "by asserting her personal belief that she was the most qualified person for the various positions."). Therefore, defendant's motion for summary judgment as to this claim is granted.

### 2. "Demotion" to Pharmacist

Plaintiff has a doctorate in pharmacology, and when he was hired his job classification was that of "Pharmacist (Clinical Specialist)." Plaintiff alleges that although he was hired as a clinical pharmacist, he was later "demoted" to the position of pharmacist. Defendant maintains that plaintiff's job change was necessitated by an increase in workload at the Rochester pharmacy.

■ According to defendant, from October 1996 through October 1998, several reductions in force decreased the pharmacy staff at Buffalo and Batavia.[8] The

---

7. Apparently, a third candidate, who is also white, applied for the position after the selection process had begun.

8. In paragraph six of its Statement of Facts not in Dispute, defendant notes that: from October 1, 1996 to October 1, 1998, the pharmacy staff at ... Buffalo went from 66.0 Full

pharmacy staff at Rochester, which consisted of three pharmacists and plaintiff, a clinical pharmacist, remained the same. The workload at the Rochester pharmacy increased substantially, due in part to the relocation of Rochester from downtown Rochester to the suburban town of Brighton, New York. In an attempt to alleviate this workload, Pudhorodsky tried to transfer a pharmacist from Batavia to Rochester, without success. Ultimately, in May of 1997, plaintiff was asked to spend one-half of his workday processing prescriptions and the other half continuing his clinical duties.

Defendant contends that it became clear that plaintiff would not perform his newly assigned duties. Thus, the VA began to remove his clinical duties. As a result, effective June 15, 1998, plaintiff's job title was changed from "Pharmacist (Clinical Specialist)" to "Pharmacist." Defendant did not alter plaintiff's pay or grade, and therefore, he suffered no economic consequences because of this action.

Plaintiff offers little to counter defendant's proffered non-discriminatory reasons for plaintiff's job change. Plaintiff does not dispute that he was assigned to assist in processing the increasing numbers of prescriptions at the Rochester pharmacy. *See* Defendant's Statement of Undisputed Facts and Plaintiff's Counter–Statement, ¶ 7. Plaintiff, however, contends that despite an increase in prescriptions throughout the VISN 2 Network, plaintiff was the only person who underwent a job change. This, however, does not address defendant's contention that Rochester, resulting in part from a change in location, experienced an increase in pre-

scriptions. Plaintiff suggests that defendant's action was suspect because he "was the only black minority clinical pharmacist in the Rochester office." Plaintiff's Counter Statement of Undisputed Facts, ¶ 7. Although this statement is technically correct, it does little to rebut defendant's proffered non-discriminatory reason for its action; plaintiff was the *only* clinical pharmacist in Rochester. More importantly, Murungi never disputes the accusation that he refused to assist with dispensing prescriptions as directed by his supervisors. Because plaintiff has not rebutted defendant's proffered, non-discriminatory reason for his job change, defendant's motion must be granted on this claim.

### 3. Termination from Employment

 Plaintiff alleges that he was terminated because of his race. Defendant, however, argues that plaintiff was terminated for misconduct.

In a letter dated July 1, 1998 ("termination letter"), Wisnieski informed plaintiff of his proposed removal. *See* Wisnieski Affidavit, Attachment 4. The lengthy and detailed letter contained a series of "charges," which specified the reasons for plaintiff's proposed termination. In general, plaintiff was charged with the refusal to carry out direct orders given by two different supervisors and with several "inappropriate" actions or statements. Specifically, the letter referred to several instances of alleged inappropriate behavior: refusal to accept a pharmacy alarm key, failure to attend the required computer training, failure to vacate his private office, and participation in several altercations arising

---

Time Employee Equivalent ("FTEE") to 59.0 FTEE. The pharmacy staff at Batavia, which was also affiliated with … Buffalo, went from 12.0 FTEE to 7.0 FTEE. The pharmacy staff at … Canandaigua went from 12.0

FTEE to 8.0 FTEE…. During this time, the [Rochester] pharmacy remained at 4.0 FTEE. Plaintiff simply disputes this paragraph, without explanation. *See* Plaintiff's Counter Statement, ¶ 7.

out of efforts undertaken to remove plaintiff from his office.

In response, plaintiff relies on his subjective opinion that these allegations are pretextual; plaintiff insists that he was terminated because of his race or ethnicity. He neglects, however, to point to specific facts in the record that would support such a conclusion.

Initially, the termination letter charges that on May 27, 1998, plaintiff was instructed by then Acting Pharmacy Manager David Robbins to take and sign for a pharmacy alarm key. Plaintiff refused. Plaintiff contends that this refusal was because his supervisors gave him conflicting instructions concerning whether he should have this key.

In addition, the termination letter also charges that plaintiff failed to attended computer training as directed. According to defendant, in late 1997, the VA underwent some changes in the software for its Computerized Patient Record System. The staff required training on the new software. This training was scheduled from mid-February 1997 through mid-March 1997. The training for Rochester pharmacists was scheduled for March 14, 1998. Plaintiff told Wisnieski that he had made his own arrangements to attend a training scheduled in Batavia for March 10. According to Wisnieski, the March 10 training was generalized training; it was not the specialized training offered for pharmacists and pharmacy technicians. Thus, plaintiff was directed to attend the March 14 training. Despite these instructions, plaintiff instead attended the March 10 training. Plaintiff was again directed to attend the proper training, scheduled for June 3, 1998. Despite that specific directive, plaintiff refused to attend.

Plaintiff simply claims that he was "harassed" despite his "proficiency on the computer." Murungi Affidavit, ¶ 14.

Plaintiff notes that he attended one computer training in Batavia, and that his supervisor insisted that he attend a second training, despite the fact that "certain non-black employees never attended even one such training program." *Id.* Murungi has provided no specifications as to the identity of these employees or the circumstances surrounding their training.

The termination letter contains several charges related to plaintiff's refusal to vacate his private office space. Before plaintiff was asked to take on additional duties, plaintiff had a private office. However, when plaintiff's duties changed, Wisnieski and Robbins determined that plaintiff's work area should be relocated from a private office to the pharmacy area. Plaintiff was advised of this change in a May 28, 1998 memorandum from Robbins, and he was given approximately two weeks to vacate his office. Murungi refused to comply. Instead, he placed written "notices" around his office advising that his belongings were not to be removed. Faced with this obstinance, officials removed his belongs. The very next day, Murungi was observed moving his belongings back into the office. In fact, Murungi never did vacate the office as directed by his superiors until he was formally terminated.

Unfortunately, the dispute concerning the office escalated. On June 15, Grant became involved in the effort to remove plaintiff from his office space. After 4:30, Grant went into plaintiff's office and attempted to remove some furniture from the room. Plaintiff sat on a desk that Grant was moving, and Grant allegedly continued to push the desk. According to plaintiff, the desk hit the office door, bruising plaintiff's legs. At some point, Robbins instructed plaintiff to leave the Rochester premises. Plaintiff refused. Ultimately, the police were called and Murungi was physically removed from the facility.

Although plaintiff generally claims that defendant's articulated reasons for his dismissal were "concocted to cover up the discriminatory and wrongful treatment which I received from my management at the VA," Murungi Affidavit, ¶ 9, plaintiff has done little to show that the allegations set forth in the termination letter were, in fact, pretextual.

For example, plaintiff argues that non-black employees were not forced to attend two computer training sessions, yet he does not address defendant's contention that the first training that plaintiff attended was not the appropriate specialized training for pharmacists. Moreover, it is clear that plaintiff felt that he should not have been forced to vacate his office. However, plaintiff does not counter defendant's claim that plaintiff was given two weeks to vacate the office, and plaintiff refused. Plaintiff does not deny moving his personal effects back into the office, or jumping onto a desk to prevent Grant from moving it. The termination letter suggests that plaintiff was terminated in part for his role in the office removal altercation. Yet plaintiff does not contend that he was unfairly singled out for discipline because of his race, or that others involved in this physical altercation should have been disciplined and were not. Plaintiff has not sustained his burden of proof here. Therefore, defendant's motion is granted on this claim.

## C. Retaliation Claim

■ Title VII makes it unlawful for "an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To make a claim for retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) adverse employment action; and (4) a causal connection between plaintiff's protected activity and the adverse employment action." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir.2000).

■ Although not clearly articulated in his complaint or his papers in opposition to defendant's motion for summary judgment, plaintiff argues that he was retaliated against in violation of Title VII. Plaintiff states generally that he complained about his treatment to the VA Office of Resolution Management and the VA Equal Employment Office.[9] Murungi Affidavit, ¶¶ 3, 36. Plaintiff filed the first complaint on July 21, 1998 and the second on August 3, 1998. Both of these complaints, however, were filed *after* the majority of events complained of here had already occurred. Although plaintiff was not officially terminated until September 4, 1998, the termination letter was dated July 1, 1998, twenty days *before* plaintiff's first complaint. Thus, plaintiff has not shown a causal connection between the protected activity and the adverse employment actions taken by defendant.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Dkt.# 16)

---

9. Plaintiff has not alleged that the he engaged in any other type of protected activity. For example, plaintiff does not claim that he complained to his employer about the alleged discriminatory treatment. *See Querry v. Messar,* 14 F.Supp.2d 437, 450–51 (S.D.N.Y.1998)

(protected activity can include voicing an objection to the employer)(quoting *Barcher v. N.Y. Univ. School of Law,* 993 F.Supp. 177, 184 (S.D.N.Y.1998), *aff'd,* 172 F.3d 37 (2d Cir.1999)).

is granted. Defendant's unopposed motion for judgment on the pleadings (Dkt.# 13) is also granted, and the complaint is dismissed in its entirety.

IT IS SO ORDERED.