**WRIGHT–KHAN**

v.

**PEOPLE'S BANK**

**No. 3:00 CV 2314 JBA.**

United States District Court, D. Connecticut.

May 30, 2003.

Patricia A. Wright–Khan, West Haven, CT, Pro se.

James F. Shea, William Joseph Anthony, Jackson Lewis, Hartford, CT, for Defendant.

### Ruling on Defendant's Motion for Summary Judgment

ARTERTON, District Judge.

*Pro se* plaintiff Patricia Wright–Khan commenced this employment discrimination action against her former employer, People's Bank ("the Bank"), one officer of the Bank and one employee of the Bank, alleging discrimination on account of protected status. Several of the claims have been dismissed, *see* Ruling on Motion to Dismiss [Doc. # 38], and the Bank (the sole remaining defendant) now moves for summary judgment [Doc. # 65]. Notice has been provided to plaintiff of the nature and consequences of a motion for summary judgment [Doc. # 69], and plaintiff has filed two responses [Docs. ## 74 & 79]. For the reasons set out below, defendant's motion is granted.

## I. Background [1]

Wright–Khan was first hired by the Bank on April 28, 1997.[2] Her employment terminated on October 20, 1997 (although her last day of work was in August 1997). The Bank contended it was a voluntary resignation,[3] Plaintiff asserted unlawful termination, and filed a complaint with the CHRO and EEOC.[4] In May 1998, Plaintiff and the Bank entered into a "Pre–Determination Conciliation Agreement," which provided that: (1) Wright–Khan would be reinstated and given full back pay and benefits; (2) the Bank admitted no violation of the law; (3) the Bank promised that there would be "no discrimination or retaliation against Complainant for having filed this complaint"; and (4) Wright–Khan released and discharged the Bank from the charges contained in the CHRO and EEOC complaint.[5]

In accordance with the terms of the agreement, Wright–Khan was offered and accepted a position at the Savin Rock branch of the Bank, and she began work on April 28, 1998.[6] On July 30, 1998, Wright–Khan was given a verbal warning for: (1) taking breaks at unauthorized times and noting incorrect times on her time card; (2) not following the senior teller's instructions; and (3) two customer complaints, including one claiming that Wright–Khan refused to take a commercial deposit from a customer who had waited in the regular line rather than the commercial line.[7] Wright–Khan disputes the Bank's basis for this warning, asserting that her alleged deficiencies were the result of conflicting instructions she received: the branch manager (Bart Connors) would give her one assignment and one schedule, and the head teller (Kathy Conners) would give her another assignment and schedule.[8] She also disputes any impropriety in the commercial customer line matter, explaining that the purpose of the separate commercial line is to expeditiously handle these special deposits, and that during the incident in question the customer was better served by waiting briefly for the commercial window teller to return.[9]

1. The following facts are set out in the light most favorable to plaintiff, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

2. Letter from Chris Iaboni to Plaintiff dated April 28, 1997 [Doc. # 68 Ex. 1].

3. Separation Notice dated 10/27/97 from plaintiff's personnel file [attached as "16 of 28" to Doc. # 79].

4. *See* Affidavit of Illegal Discriminatory Practice dated February 19, 1998 [attached as "22 of 28" to Doc. # 79] ¶ 8 at 3 ("[I]n July 1997, I was unfairly and discriminatorily disciplined and placed on probation, told to go home on August 22, 1997, and then terminated by Respondent on October 9, 1997, retroactive to August 29, 1997; Respondent then falsely informed the State Department of Labor that I resigned.").

5. Pre–Determination Conciliation Agreement (CHRO No. 9830415 & EEOC No. 16a983205) [attached as exhibit to Doc. # 10; also attached to Doc. # 79].

6. *See* Letter from Wright–Khan to Attorney Barbara Lifton, dated April 27, 1998 [attached as exhibit to Doc. # 79] ("I ... accept the offer that People's has afforded me. I am will[ing] to start work immediately in the Savin Rock location, as of tomorrow, April 28, 1998.").

7. Verbal Warning dated July 30, 1998 [Doc. # 68 Ex. 2].

8. Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 18–19; Wright Khan 3/26/03 Aff. [handwritten portion of Doc. # 79] at 18–19, 21–22.

9. Wright–Khan 3/26/03 Aff. [handwritten portion of Doc. # 79] at 22–23; Wright–Khan 10/1/99 Aff. [Doc. # 14 Ex. 1] at 5.

Eight days after receiving the verbal warning, Wright–Khan was given a written warning alleging six incidents of misconduct: (1) throwing, rather than handing, a check to the senior teller; (2) aggressively confronting the senior teller in front of Bank customers; (3) using a rude tone with the senior teller; (4) telling the assistant manager that she did not respect his authority or requirements; (5) rudeness and insubordination to the senior teller; and (6) making a vulgar comment about another employee's illness.[10] Wright–Khan again disputes the basis of this warning, and avers that she was told by a colleague at Savin Rock (Miranda Christopher) that the head teller (Kathy Conners) and the assistant manager (Darin Meders) were engaged in a scheme to have Wright–Khan fired, and had unsuccessfully attempted to enlist Christopher's assistance in the plan.[11]

On the day that the written warning was issued, Wright–Khan requested a transfer to a different branch of the Bank.[12] She explains her transfer request as a request to get away from the simmering personality conflicts at Savin Rock[13] and as a request for accommodations in that the fumes from the drive-up window bothered her.[14] She argues that her transfer request had been approved before the written warning was issued, and that she was supposed to be starting at the new branch with a clean slate but was instead given a written warning as an ill-willed send-off.[15] She also states that she was advised by Lisa Rosati, a personnel specialist, that the warning was necessary for "closure," and that she should thus sign it and get a fresh start at the new branch.[16]

Wright–Khan started work at the Century Towers branch on August 11, 1998.[17] Her assignment to this branch began badly: when she introduced herself to the branch manager (Tom Griggs), his response was "I heard about you."[18] Her co-workers at the Century Towers location "appeared to be a socially cohesive group," and their demeanor towards Wright–Khan changed for the worse when she declined several of their invitations to join them after hours.[19] Several co-workers also made references to her disabilities: Joel (a teller) at one point said "she had polio when she was a child" and "watch she [sic] pop a pill"[20]; Heather (another teller) would ask Wright–Khan for one of her pills[21]; and when Jodi (a third teller) asked Griggs (the branch manager)

10. [Doc. # 68 Ex. 3].

11. Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 19–20. To the extent offered for the truth of the matter asserted (that there was a scheme to get rid of plaintiff), this is inadmissible hearsay as there is no showing, such as the declarant's affidavit, that admissible evidence of the alleged scheme will be available at trial. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir.1985).

12. [Doc. # 68 Ex. 4].

13. Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 19–20.

14. Wright–Khan 3/26/03 Aff. [handwritten portion of Doc. # 79] at 6, 18.

15. Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 20.

16. *Id.*

17. [Doc. # 68 Ex. 3] at 2.

18. Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 20.

19. *Id.* at 13–14.

20. Wright–Khan 10/1/99 Aff. [Doc. # 14 Ex. 1] at 13; Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 5.

21. Wright–Khan 10/1/99 Aff. [Doc. # 14 Ex. 1] at 13.

"What's the matter with Pat?," Griggs replied: "She takes pills."[22] Wright–Khan variously attributes her co-workers' knowledge of her disabilities to the fact that she took her medication in plain view of everyone,[23] and to what she claims was the Bank's disclosure of her personal health information.[24]

She also had difficulties with the fumes in the parking garage where she had to park her car each day, and had repeated difficulty with an inferior quality teller stool provided by the Bank.[25] Wright–Khan asserts that her requests for accommodation in the form of a new teller stool were not granted, and that her complaints about tellers repeatedly bumping into her stool (causing her to hit her leg against her desk, thus aggravating a medical condition) were not satisfactorily addressed.[26] In part due to these complaints, Wright–Khan was on short-term disability leave from November 23, 1998 to January 1, 1999.[27]

On April 1, 1999, Griggs prepared a Notice of 90 Day Probation, recounting five alleged incidents of misconduct: (1) Wright–Khan approached another teller for quarters, and when asked to wait a moment while he helped a customer, Wright–Khan told him to be more cooperative and that the next time he bumped into her chair she would "go off"; (2) a customer who presented a check to Wright–Khan with the numeric portion filled out as "$515.50" but the written dollar amount line filled out as "five hun" was turned away, with only "I can't take this check, see ya," and in response to the customer's request for explanation, Wright–Khan said "We can finish this here or I will finish you"; (3) confronted about this incident by Griggs, Wright–Khan responded in an inappropriate manner and questioned Griggs' authority; (4) visiting the Bank as a customer, Wright–Khan told a teller "whatever, bite me"; and (6) Wright–Khan refused to sell a customer a savings bond for an unborn child, incorrectly claiming that the transaction required the recipient's social security number.[28]

Wright–Khan disputes these instances of misconduct, offering her explanation of what happened. She asserts generally that she was never rude or inappropriate, and always followed Bank policy.[29] With regard to the incorrectly completed check, she asserts that she had full authority to refuse the check and that it would have

---

**22.** Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 13.

**23.** *Id.* at 4–5.

**24.** Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 13, 21 (describing "a coercive, humiliating, demeaning pattern of my personal and medical files being accessible to employees of the defendant"); plaintiff's hand annotation ("This is the law the Bank failed to protect me under") to an unidentified guide to employee privacy [attached to Doc. # 79].

**25.** Wright–Khan 3/26/03 Aff. [handwritten portion of Doc. # 79] at 6 (fumes), 7 (stool).

**26.** *Id.* at 7, 11; Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 12; Wright–Khan 10/1/99 Aff. [Doc. # 14 Ex. 1] at 10, 14.

**27.** Letter from MetLife to Wright–Khan dated January 6, 1999, certifying short-term disability [attached to Doc. # 79]; Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 23 (recounting the reasons for her short-term disability leave).

**28.** [Doc. # 68 Ex. 7]. Each incident is also recounted in the affidavits of Thomas Griggs [Doc. # 68 Ex. 5] and Jean Bonanno [Doc. # 68 Ex. 6].

**29.** Wright–Khan 3/26/03 Aff. [handwritten portion of Doc. # 79] at 16 ("I've never on record went against Bank policy nor was rude to any customer.").

been fraud to assist the customer (who was not the drawer of the check) in completing the written portion of the check.[30] Wright–Khan explains that she gave the savings bond customer a gift envelope and literature about two different types of savings bonds, and asked that she return when the recipient was born.[31]

Before Griggs had finished preparing the Notice of 90 Day Probation, two further incidents allegedly occurred and the decision was made to terminate Wright–Khan's employment rather than put her on a 90 day probation.[32] The first concerns her refusal to work at her assigned teller station: although each teller knows that assigned teller stations change at the beginning of the month, on April 1 Wright–Khan signed into her previous month's station and refused instructions to move.[33] When a supervisor answered her question (which had been posed to another employee) related to the move, Wright–Khan told the supervisor "I wasn't talking to you, go away" and stated "Don't provoke me" in a threatening tone of voice.[34] The second and final incident was a shortage of $1,000 for her cash drawer.[35] Citing Wright–Khan's alleged "continuing disciplinary problems, rude and inappropriate behav-

ior, repeated acts of insubordination and unsatisfactory performance, including the shortfall of $1,000.00 on April 2, 1999," Wright–Khan's employment was terminated on April 5, 1999.[36]

Wright–Khan offers explanations for the $1,000 shortfall, including that (1) the teller assisted unit (a machine attached to the tellers' computers which dispenses cash) might be to blame [37]; and (2) the shortfall was caused by a computer error during the Bank's upgrade to a new computer system.[38] She rhetorically questions why she would have jeopardized her future employment prospects with the Bank,[39] and notes that no criminal charges were ever brought.[40]

Wright–Khan maintains that there is ample evidence that she was qualified for her teller position. She points to the fact that she never had a "bad shop" (apparently a situation in which a teller performs poorly when dealing with a test customer sent to rate the teller's customer service abilities).[41] She also notes that she has certificates of achievement for her teller skills and her customer service skills,[42] and points to instances where she successfully marketed bank products, such as a 10

**30.** Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 10–12.

**31.** Wright–Khan 3/26/03 Aff. [handwritten portion of Doc. # 79] at 15–16.

**32.** Griggs Aff. [Doc. # 68 Ex. 5] ¶ 15; *see also* Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 6 (noting that she never saw or signed the Notice of 90 Day Probation).

**33.** Griggs Aff. [Doc. # 68 Ex. 5] ¶¶ 16–19.

**34.** *Id.* ¶ 21.

**35.** *Id.* ¶ 23; Bonanno Aff. [Doc. # 68 Ex. 6] ¶¶ 13–14.

**36.** Griggs Aff. [Doc. # 68 Ex. 5] ¶ 25.

**37.** Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 9.

**38.** Wright–Khan 3/26/03 Aff. [handwritten portion of Doc. # 79] at 30.

**39.** *Id.* at 30.

**40.** Plaintiff's hand annotation ("The thousand was a computer error. I was not charged with embezzlement.") to an unidentified teller reference guide to balancing [attached to Doc. # 79].

**41.** Wright–Khan 10/1/99 Aff. [Doc. # 14 Ex. 1] at 15.

**42.** *Id.* at 15. The certificates are attached as exhibits to Doc. # 79.

month certificate of deposit.[43] Finally, she notes that she met performance goals and received performance bonuses while at the Bank,[44] and that the human resources specialist told her after her termination that employees fired for cause are not paid for their unused paid time off days, but Wright–Khan was.[45]

Between her first discharge in 1997 and her subsequent conciliation rehire in April 1998, Wright–Khan applied for social security disability benefits.[46] The disposition of this application is unclear. Wright–Khan filed another application for social security disability benefits on August 16, 2000, approximately 16 months after her employment with the Bank was terminated for the final time.[47] In this application, she indicates that she became unable to work on April 5, 1999.[48] A form completed by her doctor in connection with the benefits qualification process indicates that plaintiff's condition has "worsened gradually." [49]

## II.  Analysis

### A.  Scope of Plaintiff's Claims

Wright–Khan's complaint alleges that the challenged employment actions were taken on account of her race, color, sex, age, national origin, and disability, and names three defendants: the Bank, the First Vice President of the Bank (Barbara Phillips), and an attorney for the Bank (Cynthia Payne). Concluding that the laws at issue did not provide for liability for individual employees of the Bank and that only the disability discrimination claim had been administratively exhausted, the Court granted the Bank's motion to dismiss the two individual defendants and any claim based on race, color, sex, age or national origin. *See Ruling* [Doc. # 38]. What remains are Wright–Khan's assertions that the Bank terminated her employment in April 1999, failed to hire, promote or transfer her in March 1999, and failed to give her a performance appraisal and salary increase in March 1999, all on account of her disability.

It is undisputed that Wright–Khan was employed by the Bank through April 5, 1999, so there can be no failure to hire claim in March 1999. Wright–Khan's CHRO affidavit clarifies that her promotion, performance appraisal and salary increase claims arise from the alleged fact that at the time of her termination, she "was due for a salary review [and] was scheduled to be interviewed for a position

---

43.  Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 5–6; *see also* Griggs Aff. [Doc. # 68 Ex. 5] ¶ 31 ("After her last performance appraisal in April 1998, Ms. Wright–Khan received an increase in pay from $11.50/hr. to $11.85/hr.").

44.  Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 1.

45.  *Id.* at 1–2.

46.  *See* Reconsideration Report for Disability Claim dated September 8, 1997 [Doc. # 68 Ex. 13].

47.  *See* Application for Disability Insurance Benefits dated August 16, 2000 [Doc. # 68 Ex. 14].

48.  *Id.* at 1. Although the form (which was apparently completed by someone else as it is not in Wright–Khan's handwriting) incorrectly places the date of 4/5/99 in box 5(c) ("If you are no longer unable to work because of your illnesses, injuries or conditions, enter the date you became able to work."), it is clear from the "yes" answer to box 5(b) ("Are you still unable to work?") and the blank in 5(a) that April 5, 1999 is the date on which Wright–Khan became *un* able to work.

49.  Disability Determination Services form completed by Robert Peters, MD on August 8, 2000 [Doc. # 68 Ex. 15] at 1.

on the platform side of the branch," which entailed increased responsibilities. Wright–Khan 10/1/99 Aff. [Doc. # 14 Ex. 1] at 1.[50] Thus, these claims are subsumed by her termination claim: if her termination was lawful, plaintiff had no entitlement to the upcoming appraisal, salary increase and promotion potential; if it was unlawful, failure to receive these entitlements flowed from the termination and are compensable as damages. Finally, while plaintiff's CHRO affidavit describes her failure to transfer claim as a standing request ("refusing to transfer me to any other position as of August 30, 1998, on or about and continuing before and after those dates until at least April 5, 1999"),[51] there is no evidence in the record that Wright–Khan ever made any specific request for a transfer during that time period.[52]

Thus, the only claim remaining in Wright–Khan's Amended Complaint is her assertion that the Bank unlawfully terminated her employment in April 1999 on account of her disability. The following references in plaintiff's subsequent filings are therefore germane only to the extent that they may shed light on the Bank's motivations, and not as independent causes of action: (1) Wright–Khan's customer relationship with the Bank, including her assertion that after her employment ended the Bank closed her checking account[53];

(2) events related to her 1997 termination from the Bank[54]; or (3) allegations that the Bank failed to accommodate her with a proper teller stool.[55]

### B. Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is material if it "might affect the outcome of the suit under the governing law," and is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Summary judgment is appropriate even in discrimination cases [because] 'the salutary purposes of summary judgment ... apply no less to discrimination cases than to ... other areas of litigation.'" *Weinstock v. Columbia University,* 224 F.3d 33, 41 (2d Cir.2000) (*quoting Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)).

### C. Burden–Shifting Framework

■ Wright–Khan's assertion that she was unlawfully terminated on account of her disability is brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.,* and is thus analyzed using the familiar *McDonnell*

---

**50.** *See also* Griggs Aff. [Doc. # 68 Ex. 5] ¶ 30 ("Prior to her termination, Ms. Wright–Khan's annual performance appraisal was due to be completed before April 26, 1999. Because Ms. Wright–Khan was terminated on April 5, 1999, however, she never reached her appraisal date and thus, never received an appraisal.").

**51.** Wright–Khan 10/1/99 Aff. [Doc. # 14 Ex. 1] at 2.

**52.** The only evidence is to the contrary. *See* Griggs Aff. [Doc. # 68 Ex. 5] ¶ 31 ("While she

worked at the Century Towers branch, Ms. Wright–Khan never notified me that she was requesting a transfer to another position.").

**53.** Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 15.

**54.** *Id.* at 15.

**55.** Wright–Khan 3/26/03 Aff. [handwritten portion of Doc. # 79] at 7, 11; Wright–Khan 2/12/03 Aff. [attached to Doc. # 74] at 12; Wright–Khan 10/1/99 Aff. [Doc. # 14 Ex. 1] at 10, 14.

*Douglas* [56]/ *Burdine* [57] burden-shifting framework. *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir.1998). Because Wright–Khan's claim is one of disparate treatment based on alleged disability animus,[58] a prima facie case consists of proof of (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination on the basis of disability. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 253–254, 101 S.Ct. 1089; *Weinstock,* 224 F.3d at 42. "A plaintiff's burden of establishing a prima facie case is *de minimis.*" *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir.2001) (*citing Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203–204 (2d Cir.1995)).

> By making out this minimal prima facie case, the plaintiff creates a presumption that the employer unlawfully discriminated, and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action. If the defendant meets its burden, the McDonnell Douglas framework disappears and the sole remaining issue is discrimination *vel non.* The plaintiff must then meet her ultimate burden of proving that she was the victim of intentional discrimination without the benefit of McDonnell Douglas's intermediate burdens and presumptions.

*Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 77 (2d Cir.2001) (internal quotations, citations and alterations omitted).

### D. Discussion

■ On this summary judgment record, Wright–Khan can minimally make out a prima facie case of disability discrimination. The protected class in which Wright–Khan claims membership is that of qualified individuals with disabilities,[59] which requires evidence from which a fact finder could conclude that Wright–Khan is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires," 42 U.S.C. § 12111(8). There is sufficient evidence of Wright–

---

**56.** *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**57.** *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**58.** The Bank asserts that the reason for Wright–Khan's discharge was her failure to follow Bank policies and procedures, including her $1,000 shortfall and her alleged rude and inappropriate behavior. Wright–Khan asserts that she was fully qualified and capable, committed no misconduct, and that the Bank's true motive was unlawful disability discrimination. In this way, her claim is a traditional assertion of animus based on membership in a protected class rather than a failure to accommodate ADA claim. *Compare, e.g., Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 216 (2d Cir.2001) (formulation of ADA prima facie case that includes employer's failure to make accom-

modations); *Norville v. Staten Island University Hosp.,* 196 F.3d 89, 99 (2d Cir.1999) ("The employer may defeat the prima facie case, however, by demonstrating that making the proposed accommodation would result in undue hardship.") (citation omitted). *Cf. McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.").

**59.** *See* 42 U.S.C. § 12118(a) ("No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.").

Khan's disability,[60] *see, e.g.,* medical records attached to Doc. # 79, and while the evidence is controverted, a jury could conclude that Wright–Khan was capable of performing the essential functions of the teller position either with or without accommodation. She was given a raise in April 1998 and has received quarterly bonuses, she never had a "bad shop," she was given certificates of achievement for her teller skills and her customer service skills, and even when the Bank issued one of her disciplinary notices it expressed continued faith in her ability to perform her job.[61] Moreover, her affidavits contain a basis from which a jury could conclude that she was not rude or inappropriate and that she followed Bank policies and procedures. Thus, there is evidence from which a jury could conclude that Wright–Khan is a qualified individual with a disability, therefore establishing both the first and second requirements of the prima facie case (membership in a protected class and qualification for the position).[62] As it is undisputed that she was discharged on April 5, 1999, she also establishes the third element, adverse employment action.

Evidence on the fourth element, which requires that the adverse employment action occur under circumstances giving rise to an inference of disability discrimination, can be found in Wright–Khan's averment that she overheard a teller ask the branch manager "What's wrong with Pat?" and that the branch manager responded "She takes pills." [63] If a jury credited this testimony, it could conclude that Griggs believed that something was "wrong" with Wright–Khan and that her deficiency stemmed from her disability and/or need to take medication. Because Griggs was ultimately the person who decided to terminate Wright–Khan's employment, it could be fairly concluded that there were circumstances attendant to Wright–Khan's termination that could give rise to an inference of discrimination.

■ Having established a prima facie case, the burden of production now shifts to the Bank to articulate a legitimate nondiscriminatory reason for Wright–Khan's termination. *Weinstock,* 224 F.3d at 42 (citations omitted). The Bank has carried this burden by pointing to Wright–Khan's $1,000 shortage and the other claimed

---

**60.** "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(b).

**61.** *See* Verbal Warning of July 30, 1998 [Doc. # 68 Ex. 2] ("I believe that you have the ability to have a successful career here at the bank. With a little effort, I know that you will be able to succeed in these areas that I have outlined.").

**62.** The Bank's attempted reliance on Wright–Khan's applications for social security disability insurance to disprove qualification, *see Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), is unavailing on this rec-

ord. None of Wright–Khan's applications for disability benefits claim that during the time periods in question she was completely disabled from working: the first application was filed before she began working for the Bank a second time, and the second application was filed 16 months after her termination and expressly lists April 5, 1999 (the date of her termination from the Bank) as the date her most recent disability commenced. Further, her physician's report, which was submitted in connection with the second application for benefits, stated that her condition had "worsened gradually."

**63.** Wright–Khan's recounting of this conversation is not hearsay, as it is not being offered for the truth of the matter asserted (that plaintiff's problem is that she takes pills), but rather is offered as evidence of the branch manager's opinion of her.

performance deficiencies which the Bank asserts caused her termination: a bank teller's loss of $1,000, insubordination and inappropriate treatment of customers, co-workers and supervisors would certainly be a legitimate basis for termination of the teller's employment. While Wright–Khan disputes each of these bases, the Bank's burden is only to produce an explanation "which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis in original, citation omitted).

 The third step requires the plaintiff to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock,* 224 F.3d at 42. "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Id.* (internal citations, alterations and quotations omitted). It is at this stage that the plaintiff's claim fails. Even Wright–Khan's own affidavits do not dispute that her drawer was $1,000 short on April 2, 1999 (she instead offers various explanations for the deficiency), and despite her repeated protestations that she has never been rude and has always followed Bank policies and procedures, the record contains nothing to dispute that Griggs genuinely believed that Wright–Khan's performance was deficient in the ways claimed by the Bank, and that his belief in these deficiencies was the reason he terminated Wright–Khan's employment.

Even though a jury could arguably conclude that the Bank's proffered reasons for her termination were false (based on Wright–Khan's denials of ever having been rude or failing to follow Bank policies and procedures), the Bank is still be entitled to summary judgment. Although "direct evidence of discrimination is not necessary," *Carlton v. Mystic Transport,* 202 F.3d 129, 135 (2d Cir.2000) (*citing Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir.1997)), the record in this case is such that no reasonable jury could conclude that "the protected trait . . . actually motivated the employer's decision," *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (citations omitted).

[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citations omitted). Here, any issue of fact as to the accuracy of the Bank's profered reason would be at

216

least "only a weak issue of fact," and there is "abundant and uncontroverted independent evidence that no discrimination ha[s] occurred," given the complete lack of evidence that the Bank was motivated by Wright–Khan's disability when it took any action against her.

### III.   Conclusion

For the reasons set out above, there are no genuine issues of material fact left for trial and the Bank is entitled to judgment in its favor as a matter of law.   The motion for summary judgment [Doc. # 65] is GRANTED.   The Clerk is directed to close this case.

IT IS SO ORDERED.